**HOWELL, Appellant,**

v.

**HOWELL, Appellee.**

[Cite as *Howell v. Howell,* 167 Ohio App.3d 431, 2006-Ohio-3038.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 2005–CA–80.

Decided June 16, 2006.

Valerie R. Wilt, for appellant.

Keith E. Golden, for appellee.

BROGAN, Judge.

{¶ 1} This matter is before us on the appeal of Kathy Howell from a trial court decision regarding her request for increased spousal support, increased child support, and attorney fees associated with defending the appeal of the original divorce decree and for prosecuting and defending against various postdecree motions. In support of the appeal, Kathy raises the following assignments of error:

{¶ 2} "I. The trial court erred as a matter of law by requiring that Mrs. Howell demonstrate an increase in her living expenses as a prerequisite to an increase in spousal support, and its decision was against the manifest weight of the evidence.

{¶ 3} "II. The court erred as a matter of law by failing to include as income for child support Mr. Howell's substantial inheritance.

{¶ 4} "III. The trial court's decision denying Mrs. Howell's appellate fees was against the manifest weight of the evidence; the court misapplied the facts to the law and abused its discretion.

{¶ 5} "IV. The court erred as a matter of law and abused its discretion in not awarding Mrs. Howell her attorney fees and court cost in the litigation of the proceedings heard on September 2, 2004, November 11, 2004, and February 8, 2005."

{¶ 6} After reviewing the record and applicable law, we find that all four assignments of error have merit. Accordingly, the trial court judgment is reversed, and this matter is remanded for further proceedings consistent with this opinion.

I

{¶ 7} Kathy and James H. Howell II were divorced on June 20, 2002, after nearly 26 years of marriage. The Howells had three children, two of whom were emancipated at the time of the divorce. The third child, Jacob, was eight and a half years old. James had been a deputy in the Clark County Sheriff's Office, but had qualified for permanent disability benefits, due to an eye injury. James was able, however, to operate a business called Electrotech, which was a limited liability corporation that he solely owned. While the amount of income James received from Electrotech was disputed, the trial court decided to impute $10,000 of income for the business.

{¶ 8} Kathy was a fulltime homemaker during most of the marriage, but was employed parttime as a school bus driver for the Springfield City Schools at the time of the divorce. Kathy requested custody of Jacob, an equitable property division, child support, and $1,000 in spousal support per month in order to meet her financial obligations. James requested shared parenting the day before the divorce hearing.

{¶ 9} Following the hearing, the trial court awarded Kathy custody of Jacob, observing, among other things, that James was behind in paying child support despite having financial resources to pay and that "[i]n essence, Mr. Howell 'chose' to prioritize other expenses which he had during the pendency of this matter over his obligation to pay support to his son." The court went on to note that:

{¶ 10} "The overwhelming credible evidence in this case indicates that Mr. Howell has always placed his own individual interests above those interests of his children and, to this end, it is more likely than not that he will continue to make poor choices which in turn, at some point, are likely to adversely affect the parties' eight year old son."

{¶ 11} After granting Kathy custody, the court ordered James to pay $400 per month in spousal support for twelve years, plus $322.32 per month in child support. As part of the property division, the court also awarded Kathy 36.1

percent of James's disability pension from the Ohio Public Employees Retirement System.

{¶ 12} In deciding the income to be considered for child support, the court refused to impute income to James in connection with a trust that his grandfather had established. The corpus in the trust was about 1.4 million dollars, and James and his brother had a contingent interest in the trust dependent on the death of their father at some point in the future. During the marriage, James had received significant distributions from the trust, and Kathy had asked the court to impute an additional $12,000 in income per year, based on approximately $204,000 in distributions that had been made between 1981 and 1998.

{¶ 13} The trial court refused to impute additional income based on past receipts, because there was no evidence that James had legal control over any money he might receive. The court also mentioned this point when it discussed spousal support, noting that James had only a "possible" future inheritance.

{¶ 14} Kathy additionally asked for attorney fees of $14,862.70. The court granted the fees, finding that Kathy lacked the financial means necessary to pay her own fees. In this regard, the court also noted that "it is reasonable to conclude that Mrs. Howell would have been prevented from fully litigating her rights and protecting her interests in this matter if the Court would not have awarded * * * her attorney fees herein." And finally, the court observed that James had the ability to pay attorney fees, especially since his living expenses were minimal in that they were shared with a girlfriend. His prior debts had also been discharged in a bankruptcy that became final during the divorce action.

{¶ 15} On July 18, 2002, James filed a notice of appeal from the divorce decree, and raised five assignments of error. We rejected all the assignments of error on September 12, 2003. See *Howell v. Howell,* Clark App. No. 2002 CA 60, 2003-Ohio-4842, 2003 WL 22110309, at ¶ 7–32.

{¶ 16} While the appeal was pending, Kathy filed several postdecree motions. The first was a contempt motion in October 2002, based on James's failure to pay attorney fees as ordered or to pay the ordered portion of his disability check for July, August, and September 2002. This motion was withdrawn several weeks later, after James complied with the court orders.

{¶ 17} The second postdecree motion was filed on April 10, 2003, and was a request for attorney fees associated with the appeal that James had filed. In the motion, Kathy stated that she did not have funds to complete the appeal. She also noted that James had now become a vested beneficiary in his grandfather's $1,000,000 trust, because James's father had died. On the same day, Kathy filed a motion to increase spousal support due to changed circumstances. Specifically, Kathy claimed that James was no longer the recipient of discretionary funds.

Instead, under the terms of the trust, the trust now had to be terminated, with 50 percent of the corpus being paid to James.

{¶ 18} As we mentioned, we affirmed the divorce judgment in September 2003. Subsequently, on November 5, 2003, Kathy filed a motion for an increase in child support and for reallocation of the health-care order for payment of uncovered medical expenses. She also asked the court to set a date certain for payment of her part of James's disability pension, because James was frequently 30 or more days behind in payment. At this point, the trial court had not yet held a hearing on Kathy's prior requests for spousal support and attorney fees.

{¶ 19} On February 4, 2004, Kathy filed another contempt motion, asking the court to impose a contempt sanction that had originally been imposed, but stayed, in the final divorce decree. This particular contempt sanction was based on James's failure to maintain Kathy as a covered dependent on his health insurance. James's actions had cost Kathy $388. In the final decree, the court sentenced James to 30 days in jail, but suspended the sentence on the condition that he pay Kathy the $388. Almost two years later, James had still not paid this sum.

{¶ 20} Although James had become the recipient of more than half a million dollars in funds from his grandfather's trust, he filed a motion with the court on February 12, 2004, asking for a decrease in his child-support obligation. Previously, in January 2004, James had also filed a motion asking the court to order Kathy to pay his attorney fees for responding to her requests for increased spousal and child support.

{¶ 21} James filed several other motions, including a motion to modify provisions in the divorce decree relating to the tax exemption and noncovered medical expenses. In addition, James asked the court to decrease his spousal-support obligation. He followed that with a motion for a vocational evaluation of Kathy and a motion for an order temporarily stopping wage withholding due to a credit in the child-support account. Finally, James filed a motion asking for adoption of a shared-parenting plan. Most of these motions were either unsuccessful or ultimately withdrawn.

{¶ 22} On February 19, 2004, the court filed an entry ordering James to produce various discovery items and deferring the issue of attorney fees and costs until the final hearing. More than a year after Kathy's request for fees, the court still had not held a hearing on fees, nor had any of the pending motions been resolved, other than a few minor items, such as whether a vocational report would be ordered. Consequently, on April 26, 2004, the magistrate issued an order listing all pending motions and indicating the order in which they would be decided. The order specifically stated that almost all the relief was intertwined,

and that "for judicial economy the magistrate will not issue a decision until all motions are heard."

{¶ 23} Subsequently, on May 4, 2004, Kathy filed a renewed request for attorney fees. In the motion, Kathy again emphasized that she did not have the financial resources to pay attorney fees to pursue the support to which she felt entitled and that she could not afford to defend James's postdecree motions.

{¶ 24} A hearing was held before a magistrate on September 2, 2004. After the hearing, the magistrate found that James had taken questionable expenses against Electrotech's income. For example, James reported $88,365 in income for the company in 2002, but only $1,299 in profit. At the same time, however, he was using money generated through Electrotech to pay personal legal fees, personal car expenses, and the land-contract payment and utilities for his new wife's home.

{¶ 25} The magistrate additionally noted that since the divorce decree, James had become a vested beneficiary of his grandfather's trust, due to the death of both his parents. James was able to access trust proceeds by calling the attorney managing the trust. In May or June 2004, James withdrew $500,000 from the trust and used the proceeds to purchase land in Maine ($160,000 to $170,000), and a Four Winns boat ($270,000). The expenses for docking the boat, alone, were about $6,000 per year. The trust balance at that time was $270,765, and James was entitled to half the remaining proceeds.

{¶ 26} In addition, James had trust funds and an inheritance due from his parents, who had died in 2003. The magistrate held that the amount and date of receipt of the parental inheritance was uncertain and that it would be "speculative at best" to include this item in spousal support. The magistrate further held that the inheritance from the grandfather's trust was not a change in circumstance under R.C. 3105.18(F) because the inheritance was contemplated by the parties and court at the time of the divorce decree. Consequently, the magistrate did not award any increase in spousal support.

{¶ 27} Kathy filed timely objections to the magistrate's decision. Subsequently, on November 16, 2004, another hearing was held on the motion to pay medical expenses and impose the contempt sanction, the motion for appellate attorney fees, and the motion to set a date on which James would pay Kathy's portion of the disability pension. At this hearing, the parties stipulated to the report of the vocational expert, who had found that Kathy was fully employed. Among the facts disclosed at this hearing was that James had taken a draw of $40,000 in October 2004 from one of his parent's trusts and had expensed $30,000 in attorney fees through Electrotech. The fiduciary accounts for the estates of both of James's deceased parents were also placed into evidence at the hearing.

{¶ 28} Kathy testified that her current balance on attorney fees was $17,226.49 and that she did not have the ability to pay the fees. She had been paying fees at the rate of $25 per month. She indicated that she had been able to obtain representation despite not having money to pay fees. Finally, it was not disputed at the hearing that James did not pay the $388 owed for medical expenses until March 2004. James claimed he thought that he had paid the money earlier but had been mistaken.

{¶ 29} Following the hearing, the magistrate found that James's evidence as to the medical expense was not credible. The magistrate awarded attorney fees of $196.88 in connection with Kathy's effort to collect the medical fees. However, the magistrate also rejected the fees of $10,021.55 for the prior appeal, because Kathy failed to establish that she was prevented from litigating her rights. (The rest of the fees were considered at a later hearing.) Kathy again timely objected to this decision.

{¶ 30} On February 8, 2005, James dismissed his motion for shared parenting, on the eve of trial. At a hearing held on the same date, James testified about various matters, including amounts in the various trusts and estates. According to documents that had previously been admitted, James was entitled to half of $335,000 in a trust that his father had established, and he could take distribution of that money at any time. James was also entitled to half of his mother's estate, or about $328,000. James indicated that if he had chosen to invest these amounts in addition to the $500,000 minimum from his grandfather's trust, he could have earned $50,000 per year in investment income on a conservative rate of return for the combination of all three inheritances. A financial planner who testified on Kathy's behalf indicated essentially the same thing and included some other rates of earnings as well, based on actual performance statistics for investment funds.

{¶ 31} During this hearing, James also asked that Kathy pay his fees for defending against her motions, as well as for prosecution of his own motions, such as the parenting motion he filed and withdrew, the motion for increased visitation he filed and withdrew, and the motion to reduce child support. James indicated in the hearing that he had expressed concern about the neighborhood in which his son and ex-wife lived, but had not purchased a home for his son in a better area, even though he had the money to do so.

{¶ 32} Following the hearing, the magistrate filed a decision on February 15, 2005, finding that James was "less than credible," particularly about matters relating to his corporate income from Electrotech. The magistrate added $47,384 back into James's income, based on questionable business deductions for personal expenses. He also added a very minor amount of ordinary income from the trust, and $8,000 in net long-term capital gains. Based on these facts, the magistrate increased child support to $687.95 per month. The magistrate rejected the

mutual requests for attorney fees, finding that neither side had been prevented from fully litigating. This included the remainder of the attorney fees that Kathy had sought, i.e., the fees she incurred in filing postdecree motions and in responding to James's motions. Kathy again filed timely objections to the magistrate's decision.

{¶ 33} After an objection hearing that was held on June 28, 2005, the trial court filed an order on July 8, 2005, rejecting all objections. The court did not specifically address the details of the objections but simply indicated it had conducted a de novo review and had found each objection without merit. This appeal then followed.

{¶ 34} The first assignment of error deals with the trial court's rejection of increased spousal support. In this regard, Kathy contends that the trial court erred by requiring her to demonstrate increased living expenses and by finding that the inheritance was not a change in circumstances.

{¶ 35} We review decisions on spousal support for abuse of discretion, which means that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. However, we have stressed before that decisions are unreasonable if they are not supported by a sound reasoning process. See, e.g., *Jackson v. Jackson* (2000), 137 Ohio App.3d 782, 799, 739 N.E.2d 1203, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597. After reviewing the spousal-support decision in this case, we find that it is not supported by a sound reasoning process.

{¶ 36} Under R.C. 3105.18(E), the court may modify a spousal-support obligation if it finds a change in circumstances. An inheritance has been considered a change of circumstances sufficient to merit alteration in the amount or duration of spousal support. See *Tissue v. Tissue*, Cuyahoga App. No. 83708, 2004-Ohio-5968, 2004 WL 2535430, at ¶ 23–29.

{¶ 37} In the present case, the trial court noted in the divorce decree that the parties had enjoyed a very comfortable lifestyle during marriage. The court further observed that while James would continue to enjoy an above-average standard of living, Kathy would be reduced to a more modest standard. The court refused, however, to consider James's potential inheritance when awarding spousal support, because his interest was only speculative. At that time, James was merely a contingent beneficiary of the trust, and his parents were both still living.

{¶ 38} After the divorce was granted, both of James's parents died, and he became a vested beneficiary in his grandfather's trust. He thereafter withdrew

large sums of money from the trust. Upon his parents' death in 2003, James also became entitled to one-half of the amounts in trusts that they had maintained, and to one-half of their estates. When Kathy asked for an increase in spousal support, the magistrate rejected the request, because the inheritance from the grandfather's trust was clearly contemplated at the time of the divorce. We find this reasoning process unsound. Although the parties were obviously aware of the prospective inheritance from the grandfather at the time of the divorce, this item was specifically excluded from consideration. What was contemplated at the time of the divorce was that James did not have access to the trust money and was only a contingent beneficiary on the fund.

{¶ 39} In a somewhat similar situation, a trial court found that the amount and receipt of an inheritance was uncertain and that a spousal support award based on the inheritance would be speculative. However, the trial court retained continuing jurisdiction over the support obligation and provided that the wife could seek modification of the spousal-support award upon filing a motion after the husband received anticipated inheritance distributions. *Morgan v. Morgan* (Oct. 24, 2001), Wayne App. No. 01CA0017, 2001 WL 1280277, *2.

{¶ 40} On appeal, the Ninth District Court of Appeals found no abuse of discretion in the decision not to include potential investment income from the inheritance into the spousal-support award. However, the Ninth District found no abuse of discretion because the trial court had chosen to allow the ex-wife to file a motion for modification upon distribution of the inheritance. Id.

{¶ 41} Based on the preceding discussion, we find that the trial court erred in finding that the vesting of funds from the grandfather's trust was not a "changed circumstance" under R.C. 3105.18(C). We also find that the trust funds and other money inherited by James after the death of his parents was a change in circumstances warranting modification of spousal support. Notably, these issues were not discussed at all in the divorce decree.

{¶ 42} Accordingly, the first assignment of error has merit and is sustained. This matter is reversed, and the cause is remanded to the trial court for calculation of the amount of increased spousal support that should be awarded, based on the increased income James should have realized for investment of the funds to which he was entitled from all three trusts and the estates of his parents.

{¶ 43} In this regard, we should make one other point. In the decision on spousal support, the magistrate noted that it was impossible to consider investment income because Kathy failed to present evidence estimating potential yields on investment. However, the magistrate had filed an order prior to the hearing indicating that the many pending motions were intertwined, that several hearings would be held, and that no decision would be issued until all the hearings were concluded. Evidence was presented at other hearings regarding investment

yields, and the magistrate violated his own order by issuing decisions before concluding all the hearings.

{¶ 44} Because a change in circumstances existed, we do not need to extensively address Kathy's claim that the inadequacy of the original support award obviates the need to show a change. However, this assertion does not appear to be a correct statement of law. Under R.C. 3105.18(E), courts may modify the amount or terms of spousal support only upon a finding of a change in circumstances of either party, and, in divorce situations, when modification is allowed in the decree or in a separation agreement incorporated into the decree.

{¶ 45} In light of the preceding discussion, the first assignment of error is sustained.

## II

{¶ 46} The second assignment of error is based on the trial court's failure to include James's substantial inheritances as income for child-support purposes. When the magistrate rejected inclusion of inheritance income, he noted that Kathy had asked the court to find James voluntarily unemployed and to impute current employment income and interest income from inheritances. However, this was an incorrect factual statement. Kathy did not ask the court to impute interest income from inheritances when she requested an increase in child support. Instead, she simply filed a motion asking for an increase in child support. Kathy also did not ask the magistrate at the hearing to impute interest income based on voluntary underemployment. And finally, in objecting to the magistrate's decision, Kathy clearly stressed that potential interest income should be included as gross income under R.C. 3119.01(C)(7). The trial court did not address this issue when it overruled Kathy's objections to the magistrate's decision. As we noted, the court failed to specifically comment on any of the objections.

{¶ 47} In order to modify child support, the trial court must find a substantial change in circumstances, which is defined in R.C. 3119.79(A) as a ten-percent deviation from the amount of child support previously ordered. The magistrate found such a change by including James's self-employment income. However, the magistrate refused to also include potential investment income from the inheritances.

{¶ 48} R.C. 3119.01(C)(5) defines income in two ways. For individuals employed to full capacity, income means "the gross income of the parent." R.C. 3119.01(C)(5)(a). If an individual is fully employed, the definition of "gross income" in R.C. 3119.01(C)(7) applies. For persons who are unemployed or underemployed, income means the parent's gross income plus any potential

income. R.C. 3119.01(C)(5)(b). In the latter situation, R.C. 3119.01(C)(11) provides methods of imputing potential income to the individual who is underemployed.

{¶ 49} Because the magistrate did not find James to be underemployed, his income would be governed by the definition of "gross income" in R.C. 3119.01(C)(7), which defines "gross income" as "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, overtime pay, and bonuses * * *; commissions; royalties; tips; rents; dividends; severance pay; pensions; interest; trust income; annuities; social security benefits, including retirement, disability, and survivor benefits that are not means-tested; workers' compensation benefits; unemployment insurance benefits; disability insurance benefits; benefits that are not means-tested and that are received by and in the possession of the veteran who is the beneficiary for any service-connected disability under a program or law administered by the United States department of veterans' affairs or veterans' administration; spousal support actually received; and all other sources of income. 'Gross income' * * * includes * * * self-generated income; *and potential cash flow from any source.*" (Emphasis added.)

{¶ 50} The statutory definition of income is very broad and includes income from trusts, as well as potential cash flow from any source. This is consistent with R.C. 3103.03(A), which requires a biological or adoptive parent of minor children to support the children "out of the parent's property or by the parent's labor."

{¶ 51} In *Bishop v. Bishop,* Scioto App. No. 03CA2908, 2004-Ohio-4643, 2004 WL 1945637, the trial court included potential rental income from a property in gross income, even though the property was not currently being rented, nor was it in a condition to be rented. Id. at ¶ 17. See, also, *Murray v. Murray* (1999), 128 Ohio App.3d 662, 668, 716 N.E.2d 288 (unexercised stock options are potential cash flow and should be included in gross income); and *Sizemore v. Sizemore* (Oct. 14, 1994), Montgomery App. No. 13673, 1994 WL 558917, *3 (non-income-producing asset may be considered potential cash flow and is properly included in gross income of fully employed obligor). As we pointed out in *Sizemore,* "[n]o finding of voluntary unemployment or underemployment is required to find the existence of potential cash flow." Id. We also stressed:

{¶ 52} "[O]ne of the purposes of the 'potential cash flow' provision in R.C. 3113.215(A)(2) * * * [is] to prevent a parent from avoiding child support obligations by shifting present income to a cash flow expected to be enjoyed at some future time, when the children have become emancipated." Id.

{¶ 53} In this regard, James chose to transfer money to items that could produce cash flow at a future point. For example, James testified that he spent $160,000 to $170,000 of the trust proceeds on land in Maine as an investment. His choice to shift present income to a later point, perhaps in an attempt to avoid child-support obligations, should not be rewarded. James testified that he could have earned $50,000 per year on the funds that he inherited but chose not to do so.

{¶ 54} Courts do sometimes use the phrase "imputed income" when referring to potential cash flow, but that does not mean they have made a finding of voluntary unemployment or underemployment under R.C. 3119.01(C)(11). For example, the court referred to "imputed income" in *Murray* when it discussed the potential income to be attributed to the appreciation in unexercised stock options. 128 Ohio App.3d. at 674, 716 N.E.2d 288. However, the obligor in Murray was fully employed and the income was included as "potential cash flow from any source" under R.C. 3113.215(A)(2) (the predecessor to R.C. 3119.01(C)(7)). Using the word "imputed" is simply one way of describing potential income and does not mean that a court has made a finding under R.C. 3119.01(C)(11) that income should be imputed because the obligor is unemployed or underemployed. By requiring such a finding in the present case, the magistrate's decision was incorrect and was not supported by a sound reasoning process.

{¶ 55} Accordingly, the second assignment of error has merit and is sustained. This matter is remanded so that the trial court may take the amount of potential investment income from the three inheritances into account in calculating James's "gross income" for child-support purposes.

## III

{¶ 56} The third and fourth assignments of error raise the issue of attorney fees and will be considered together. In both assignments of error, Kathy challenges the rejection of attorney fees as against the manifest weight of the evidence and as an abuse of discretion. The third assignment of error deals with appellate fees, and the fourth assignment of error concerns fees for prosecuting various postdecree motions, as well as for defending against various postdecree motions that James filed.

{¶ 57} As we noted, the trial court stated in the original divorce decree that Kathy lacked the financial means necessary to pay attorney fees and that James had the ability to pay attorney fees. The only factor that had changed between this decision and the magistrate's rejection of fees was that James inherited more than a million dollars. Kathy's income and expenses remained largely the same. Therefore, the magistrate's decision is not just unsupported by sound reasoning; it is inexplicable.

{¶ 58} The magistrate relied on Kathy's testimony, elicited on cross examination, that her lack of income had not prevented her from obtaining legal services. In a similar situation, the Eighth District rejected a husband's claim that his wife should not be awarded fees because she had managed to pay some of her attorney fees and had money to obtain experts to assist her in the litigation. The Eighth District affirmed an award of $50,000 against the husband, noting that:

{¶ 59} "Husband first contends that the trial court erred in ordering him to pay $50,000 of Wife's attorney fees because there is no evidence that, without the award, she would have been prevented from fully litigating and protecting her interests. Husband argues that Wife was able to pay some of her attorney fees prior to the award, had sufficient funds to buy a house and purchase household items, and had monies to obtain various experts to assist her in the litigation. Therefore, he contends, she had sufficient funds to adequately protect her interests in the litigation. We are not persuaded.

{¶ 60} "The evidence at trial demonstrated that Wife's income was significantly less than Husband's and that she had borrowed money to pay her attorney and household expenses. The fact that Wife was able to borrow money to pay her attorney does not mean that she would be able to pay the remaining fees without an adequate award. Moreover, Husband's argument that Wife was not prevented from protecting her interests because she retained experts to assist her is without merit. Apparently *Husband would have the court award attorney's fees only if Wife's financial situation prevented her from participating in the litigation at all. That is not the standard, however.*" (Emphasis added.) *Pruitt v. Pruitt,* Cuyahoga App. No. 84335, 2005-Ohio-4424, 2005 WL 2046422, at ¶ 93–94.

{¶ 61} In the present case, Kathy's income was significantly lower than James's income, and she had borrowed money from her father to pay some attorney fees. Given Kathy's low income level, there is no way she would have been able to pay the remaining fees without an award. As we said, the magistrate's decision is inexplicable in view of the earlier finding that Kathy could not afford to pay fees. The trial court, therefore, abused its discretion in rejecting Kathy's request for attorney fees. *Oatey v. Oatey* (1992), 83 Ohio App.3d 251, 263, 614 N.E.2d 1054.

{¶ 62} Under the statute in effect at the time of the fee requests, a trial court may award reasonable fees at any stage of the proceedings, if it decides the other party has the ability to pay fees. See R.C. 3105.18(H) (deleted and new provision enacted as R.C. 3105.73, effective April 27, 2005). In the present case, the magistrate found that Kathy's attorney fees were reasonable and necessary and that James had the ability to pay the fees when the trust funds were factored in. Therefore, on remand, the trial court should award the full amount of the attorney fees that Kathy requested.

{¶ 63} Based on the preceding discussion, the third and fourth assignments of error have merit and are sustained.

{¶ 64} Because all four assignments of error have been sustained, the judgment of the trial court is reversed. This cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

WOLFF and DONOVAN, JJ., concur.