[Cite as *Sweeney v. Sweeney*, 2019-Ohio-1750.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DEBORAH E. SWEENEY, | : | APPEAL NO. C-180076 |
| | | TRIAL NO. DR0802131 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| BRIAN J. SWEENEY, | : | |
| | | |
| Defendant-Appellant. | : | |

Appeal From: Hamilton County Common Pleas Court, Domestic Relations Division

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: May 8, 2019

*Waite, Tomb & Eberly, LLP,* and *Wayne E. Waite*, for Plaintiff-Appellee,

*Blake P. Somers, LLC, Blake Somers* and *Stephanie L. Wolfinbarger,* for Defendant-Appellant.

ZAYAS, Judge.

{¶1} Defendant-appellant Brian J. Sweeney ("Brian") appeals from the domestic relations court's January 25, 2018 entry, captioned "Judge's Amended Decision," which, inter alia, modified the child-support obligations of Brian and his former wife, plaintiff-appellee Deborah E. Sweeney ("Deborah"). We reverse because we cannot ascertain if the trial court applied the correct standard in determining whether Brian was voluntarily underemployed, and because the trial court erred in determining the amount of income to be imputed to Brian, and in employing a split-parenting worksheet to calculate Brian's child-support obligation after it had adopted a shared-parenting plan.

## I. Brian's Motions to Reallocate Parental Rights and Responsibilities

{¶2} The parties were married in 1998. They have four children born during the marriage. The parties ended their marriage in November 2008 by a decree of dissolution which designated Deborah as the residential parent and legal custodian of all four minor children, and ordered Brian to pay $375 per month per child plus 2 percent fees. The trial court modified the child-support order in October 2011. And on February 12, 2016, the trial court journalized an agreed entry modifying the school district designation for their older son to Indian Hill School District, "in which Brian resides." This entry expressly left the other provisions of the decree of dissolution intact, and did not alter any parental rights or responsibilities including Deborah's legal custody over all four children.

{¶3} In 2017, Brian filed two motions that sought to modify the parties' parental rights and responsibilities, including parenting time and child support. His first motion, filed on January 23, sought to reallocate parental rights and responsibilities, or in the alternative to modify the terms of the decree of dissolution. Brian's motion contemplated a split-parenting arrangement where there is more

2

than one child who is the subject of an allocation of parental rights and responsibilities and each parent is the residential parent and legal custodian of at least one of those children. Brian sought to modify custody and child support to make the orders reflect that he was caring full-time for his older son. He stated that the child had lived with him since the 2015-16 academic year, and while this was "by agreement of both parents, [Deborah was] still designated the residential parent and legal custodian," and Brian continued to pay her child support for the child. Therefore, Brian sought a reallocation of parental rights and responsibilities to make him the legal custodian of the child, with Deborah remaining the custodian of the other three. In the alternative, Brian sought a modification of the child-support order and reallocation of income tax dependency exemptions. On the same day, Brian filed a proposed child-support worksheet—a split-parenting computation worksheet under former R.C. 3119.023.

{¶4} At a November 1, 2017 hearing on Brian's first motion, the parties informed the trial court that they were negotiating a shared-parenting plan where each of them would have "equal parenting rights to all four children." But the parties had yet to reach an agreement over parenting time and child-support obligations. The trial court suggested reserving the child-support issue until after the parties' parenting time had been established. The trial court set both issues for trial, and asked Brian to file a shared-parenting plan if the parties could reach an agreement.

{¶5} On November 9, 2017, Brian filed "Father's Amended/Renewed Motion for Shared Parenting" with an attached jointly requested shared-parenting plan. Section 1.1 of the plan provided that, "The parties agree to share the physical and legal care of their minor children. * * * Each party shall be considered the residential parent and legal custodian of the minor children at all times wherever they are physically located, regardless of the allocation of parenting time."

## II.  Trial on the Motions

{¶6}   By the day of trial, November 11, 2017, both Brian and Deborah had agreed to the plan in all respects except as to the child-support amount.  The trial court inquired of both parents whether they agreed to the jointly requested shared-parenting plan submitted in accordance with R.C. 3109.04(D)(1)(a)(i).   Both answered in the affirmative and stated that shared parenting was in their children's best interest.  The court responded: "Okay.  Very good.  All right.  The Court will accept that[.]"

{¶7}   The matter then proceeded to trial on the child-support issue alone. Brian and Deborah were the only witnesses.  Both parties provided testimony regarding their current and previous employment, and offered numerous exhibits including pay stubs, tuition statements, and income tax returns.  Other than the trial court's statement that it would adopt the shared-parenting plan, there was little testimony offered on the division of parenting time between the parties either under the then-existing custody orders or under the newly agreed-to shared-parenting plan.

{¶8}   Brian testified that he currently worked as a car salesperson at a dealership owned by a family member.  His income was derived solely from sales commissions.  He expected his total income for 2017 to be $45,488.  Brian testified that he had sought out other types of employment, but that "[i]t's hard to find something that would allow me the flexibility in my schedule to be able to have my parenting time schedule with my kids as far as taking them to school and picking them up [or] if they have an extracurricular activity or a sporting event[.]"   He testified that he was responsible for the children's transportation to and from school and their extracurricular activities during his parenting time.

{¶9}   Brian stated that he worked Monday through Friday and every other weekend.  He worked from 9:00 a.m. until 8:00 p.m. on days that he did not have

4

parenting time with his children. He also worked weekends when he did not have parenting time.

{¶10} Brian also testified that he had had higher income in previous years. Since the late 1990s he had worked in various capacities at car dealerships. Between 1998 and 2000, Brian had worked, not solely as a salesperson, but also in the finance department of a car dealership. He testified that his income during that period was "maybe around $60,000."

{¶11} From 2001 to 2016, Brian derived his income as part owner of the Lebanon Chrysler Dodge car dealership. From his income tax returns, in 2014, Brian's annual income was approximately $90,000. His 2015 income was $80,718.

{¶12} In 2016, Brian sold his share in the dealership following a dispute with a partner. His 2016 income was over $1,000,000 due to the dealership sale. Brian also testified that after paying taxes and attorney fees, he kept the remaining $530,000 of the sale proceeds in a savings and checking account where it earned an interest rate of between 0.2 and 0.7 percent. Brian testified that he was "waiting until this all gets resolved" before allocating the funds towards retirement savings or using the funds to pay off his mortgage.

{¶13} Brian testified that it would be very difficult to replace his ownership income while working as a car salesperson. He had sought other employment opportunities in the car-sales business but had been unable to find employment that afforded him the schedule flexibility to have parenting time with his children.

{¶14} At the trial court's request, the parties submitted proposed child-support computation worksheets. Brian submitted two proposed worksheets each using the statutory worksheet to be employed when "the court issues a shared parenting order," under former R.C. 3119.022. Deborah's proposed worksheets are not part of our record.

### III. The Trial Court's Amended Decision

{¶15}  On January 25, 2018, the trial court issued its amended decision.  The amended decision stated that the court was ruling on Brian's "present motion," and in doing so was referring to the January 23, 2017 split-parenting motion seeking sole custody over his older son.  In the very next sentence, the decision stated that it had "issued a new Decree of Shared Parenting[.]"

{¶16}  Despite the court's adoption of the jointly requested shared-parenting plan during the hearing, the amended decision states that Brian's motion for modification of child support is "based on the parties' new parenting arrangement, in which Brian becomes the residential parent of one of the three children."

{¶17}  Additionally, the amended decision stated that it granted Brian's "Motion to Modify," and ordered Brian to pay child support "for the parties' three (3) children who are in Deborah's custody."  Significantly, the trial court employed a split-parenting worksheet to calculate the parties' child-support obligations.  It ordered Brian to pay child support in the amount of $386.95 per month per child plus the 2 percent fee for each of the three children "who are in Deborah's custody."  The court then declared that "Issues regarding tax exemptions and medical expense reimbursement shall remain as set forth in the Shared Parenting Plan."

{¶18}  To determine Brian's income for use in the split-parenting worksheet, the trial court had reviewed the testimony and evidence presented at trial and found that Brian was a college graduate with 25 years of experience in the field of car sales.  He had no physical or mental limitations.  The court found that Brian was voluntarily underemployed and then calculated his imputed income, or what he would have reasonably earned had he been fully employed.

{¶19}  We note that although the amended decision stated that the trial court had already issued a new decree of shared parenting, the court did not journalize that decree until February 5, 2018, two weeks after the amended decision had been

entered. The jointly requested shared-parenting plan attached to and incorporated in the decree was signed by both parties and their counsel. The plan included a provision governing child support. But the text of Section 4.1 provides only that:

> Effective TBD, Father shall pay to Mother for support of the parties' minor children the sum of $TBD per month, plus a 2% processing fee, for a total of $TBD per month[.] * * * The Child Support Worksheet is attached noting the guideline amounts and the rationale for any deviation in order to arrive at this child support amount which is in the best interest of the minor children.

{¶20} No child support worksheet was attached to the decree or the shared-parenting plan. Moreover, the plan includes an integration clause in section 14 that indicates that the submitted plan represented "the entire agreement between the parties[.]"

{¶21} Brian appealed from the trial court's amended decision. Because the amended decision changes the residential parent and legal custodian of at least one of the four children, it is a final, appealable order under R.C. 2505.02(B)(2). *See In re E.N.*, 1st Dist. Hamilton No. C-170272, 2018-Ohio-3919, ¶ 20.

### IV. The Trial Court Erred in the Determination of Voluntary Underemployment and Imputed Income

{¶22} In his first assignment of error, Brian asserts that the trial court abused its discretion when it found that he was voluntarily underemployed and when it calculated what his reasonable income would have been if he had been fully employed. We agree.

{¶23} "Whether a parent is 'voluntarily underemployed' * * * and the amount of 'potential income' to be imputed to [him], are matters to be determined by the trial court based upon the facts and circumstances of each case." *Rock v. Cabral*, 67

7

Ohio St.3d 108, 616 N.E.2d 218 (1993), syllabus. A reviewing court will not disturb the trial court's determination on these matters absent an abuse of discretion. *Id.* While this is a deferential standard, a trial court can abuse its discretion where there is no evidence in the record to support its findings or where the court employs the wrong legal standard. *See Marron v. Marron*, 12th Dist. Warren No. CA2013-11-109, 2014-Ohio-2121, ¶ 50; *see also Trenkamp v. Trenkamp*, 1st Dist. Hamilton No. C-000203, 2000 WL 1760504, *7 (Dec. 1, 2000).

{¶24} In calculating child support, a trial court must first determine the annual income for each parent. *See Cwik v. Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, ¶ 89. The income for a parent who is employed to full capacity is that parent's gross income or "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable." *See* former R.C. 3119.01(C)(5)(a) and 3119.01(C)(7).[1]

{¶25} Income for a parent who is underemployed, however, is the sum of any gross income and any potential income attributable to that parent. *See* former R.C. 3119.01(C)(5)(b). "Potential income" includes imputed income that the court determines the parent would have earned based on specified criteria found in former R.C. 3119.01(C)(11)(a), and imputed income from any nonincome-producing assets of the parent under former R.C. 3119.01(C)(11)(b). The potential-income criteria under former R.C. 3119.01(C)(11)(a) include the age and any special needs of the children and factors relating to the parent, including the parent's prior employment experience, education, skills and training, and employment availability, as well as the local wages available to be earned. *See Reynolds-Cornett v. Reynolds*, 12th Dist. Butler No. CA2013-09-175, 2014-Ohio-2893, ¶ 10. A trial court must first find that a

---

[1] We note that H.B. No. 366, which changed the statutory child-support calculation scheme employed by the trial court here, became effective on March 28, 2019.

parent is voluntarily unemployed or underemployed before it can impute income to that parent. *See Cwik* at ¶ 89.

### a. Voluntary underemployment

{¶26} The question of whether a parent is voluntarily underemployed is a question of fact for the trial court which will not be disturbed on appeal absent an abuse of the court's discretion. *See Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, at ¶ 94.

{¶27} A voluntary reduction in income is not sufficient in and of itself to establish that potential income should be imputed to the parent. *See Woloch v. Foster*, 98 Ohio App.3d 806, 811, 649 N.E.2d 918 (2d Dist.1994). The test is not only whether the change was voluntary, but also whether it was made with due regard to the parent's income-producing abilities and his duty to provide for the continuing needs of the children. *See Robinson v. Robinson*, 168 Ohio App.3d 476, 2006-Ohio-4282, 860 N.E.2d 1027, ¶ 44 (2d Dist.); *see also Warner v. Warner*, 3d Dist. Union No. 14-03-10, 2003-Ohio-5132, ¶ 22. The record must demonstrate an objectively reasonable basis for reducing employment income, where "reasonableness is measured by examining the effect of the parent's decision on the interests of the child." *Aldo v. Angle*, 2d Dist. Clark No. 09-CA-103, 2010-Ohio-2008, ¶ 35. The goal is to protect and insure the best interest of the children and "[t]he parent's subjective motivations for being voluntarily unemployed or underemployed play no part in the determination whether potential income is to be imputed to that parent in calculating his or her support obligation." *Rock*, 67 Ohio St.3d at 111, 616 N.E.2d 218.

{¶28} However, on the state of this record, we cannot say that the trial court determined, as an initial matter, whether it was ruling on a motion to modify custody and child-support obligations under Brian's initial split-parenting motion, or under the subsequent jointly requested shared-parenting plan, which was the matter

ultimately before the court. Moreover, we cannot say that the trial court evaluated the impact of Brian's parenting time under the newly adopted shared-parenting plan. Accordingly, we cannot determine if the trial court applied the correct standard and must sustain the first assignment of error as to the determination of voluntary underemployment. *See Marron*, 12th Dist. Warren No. CA2013-11-109, 2014-Ohio-2121, at ¶ 50.

### b. Imputed income

{¶29} Next, Brian challenges the trial court's decision to impute $110,080 of income to him. The determination of each parent's income is the mandatory first step in allocating child-support obligations. The trial court found that because Brian had "earned $60,000 in 1999," when he worked in the finance department of a car dealership, that his income in 2017 would be $90,080 if he were "fully employed in car sales." The court also found that Brian "could and should" have been making a four percent interest rate on the deposited proceeds from the sale of his car dealership, which would yield $20,000 of annual interest income. The court added the two values to determine the income that Brian would have earned if fully employed. The record does not reflect that the trial court employed Brian's gross income of approximately $45,000 in its calculations as required under former R.C. 3119.01(C)(7).

{¶30} **No basis for imputed salary**. There was no basis in the record for determining that Brian's "reasonable income if he were fully employed in car sales" was $90,080 per annum. The trial court arrived at that amount by taking Brian's $60,000 annual income in 1999, a portion of which was earned working in the finance department, and then adjusting for inflation under the consumer price index. In a footnote, the trial court noted that it relied on an inflation calculator of the consumer price index ("CPI") as found on the Bureau of Labor Statistics website. CPI is a measure of the average change over time in the prices paid by urban

10

consumers for a market basket of consumer goods and services including food, shelter, and medical and legal services. *See Biery v. United States*, 818 F.3d 704, 713 (Fed.Cir.2016).

{¶31} A court may take judicial notice of past CPI rates because they are generally known and not subject to dispute. *See* Evid.R. 201; *see also In the Matter of Petty*, 3d Dist. Auglaize No. 2-80-4, 1980 WL 351976 (June 27, 1980). Here, however, there was no testimony of any kind relating the impact of CPI inflation over a 20-year period to potential income in Brian's profession. Accordingly, the use of CPI for forecasting wage growth is speculative where there is no other evidence supporting what impact the consumer price index inflation rate would have had on wages. *See Wright v. Cramer*, 2018-Ohio-764, 107 N.E.3d 836, ¶ 32-34 (2d Dist.).

{¶32} The record is also silent on other evidence that may have guided the court in imputing income, such as the average earning capacity of a car salesperson in Cincinnati, the availability of other, higher paying car-sales jobs in the area, the prevailing wages in the area, and whether Brian's skills would have transferred to other, more lucrative areas of employment. *See* former R.C. 3119.01(C)(11)(a)(iv) and (v); *see also Wright* at ¶ 24. *Compare Daniel v. Daniel*, 1st Dist. Hamilton No. C-060814, 2007-Ohio-5461, ¶ 18-19. Accordingly, the trial court's decision to impute $90,080 of income to Brian is not supported by the record and was an abuse of discretion. *See Marron*, 12th Dist. Warren No. CA2013-11-109, 2014-Ohio-2121, at ¶ 50.

{¶33} **Deposited funds were not a "nonincome-producing asset."** Brian next argues that the trial court erred when it categorized the deposited business-sale proceeds as a nonincome-producing asset under former R.C. 3119.01(C)(11)(b), and imputed $20,000 of annual interest income to him.

{¶34} Brian had deposited $530,000, the remaining proceeds from the sale of his auto sales business, into a savings and checking account where they earned a

11

small amount of interest. Brian testified that he was "waiting until this all gets resolved" before using the funds for retirement or to pay off his mortgage.

{¶35} In its amended decision, the trial court correctly noted that the corpus of Brian's business-sale proceeds was a nonrecurring payment and was not to be included in the calculation of income. *See* former R.C. 3119.01(C)(7)(e) and (C)(8). But the court then found that Brian had "elected to place those funds in minimal interest accounts to reduce his income and child support obligations." Thus the court stated that "[c]onsistent with [former] R.C. 3119.01(C)(11)(b), this Court is convinced that he could and should be making four percent interest on that $500,000, or $20,000."

{¶36} Former R.C. 3119.01(C)(11)(b) provided for the imputation of potential income to an underemployed parent from any nonincome-producing asset, as determined from the local passbook savings rate or another appropriate rate as determined by the court or agency, not to exceed the rate of interest specified in R.C. 1343.03(A), if the income was significant.

{¶37} However, R.C. 3119.01(C)(11)(b) does not permit the imputation of income from income-producing assets. *See Misra v. Mishra*, 10th Dist. Franklin No. 17AP-306, 2018-Ohio-5139, ¶ 30. Assets deposited in an account earning interest are, in fact, "income-producing" and do not fall within the rubric of nonincome-producing assets under former R.C. 3119.01(C)(11)(b). *See Rapp v. Rapp*, 89 Ohio App.3d 85, 89, 623 N.E.2d 624 (12th Dist.1993); *see also Willman v. Cole*, 4th Dist. Adams No. 00CA702, 2001-Ohio-2484. Thus the trial court erred in imputing additional income from the remaining business-sale assets to Brian under former R.C. 3119.01(C)(11)(b).

{¶38} We note that while the trial court erred in finding the business-sale deposits to be a nonincome-producing asset, it nonetheless could have imputed additional interest income from the $530,000 as part of Brian's "gross income" as a

"potential cash flow from any source." *See* former R.C. 3119.01(C)(7); *see also Misra* at ¶ 35; *Howell v. Howell*, 167 Ohio App.3d 431, 2006-Ohio-3038, 855 N.E.2d 533, ¶ 51 (2d Dist.). One of the purposes of the potential-cash-flow provision is "to prevent a parent from avoiding child support obligations by shifting present income to a cash flow expected to be enjoyed at some future time, when the children have become emancipated." *See Sizemore v. Sizemore*, 2d Dist. Montgomery No. 13673, 1994 WL 558917, *3 (Oct. 14, 1994); *see also Smart v. Smart*, 3d Dist. Shelby No. 17-07-10, 2008-Ohio-1996, ¶ 30.

{¶39} But even if the trial court had employed the proper means to impute additional interest income to Brian, there is no competent evidence in our record to support the trial court's determination that those assets would likely return four percent interest per annum. Evidence of what interest to impute to deposited assets can come from competent testimony or from the court taking judicial notice of commonly accepted rates available for low-risk investments like the federal short-term Treasury Bill rate. *See Misra* at ¶ 37-40; *see also* former R.C. 3119.01(C)(11)(b) and 1343.03(A) (employing the federal short-term rate to compute interest). Here, the record is silent as to how the trial court arrived at its determination that Brian could have earned four percent on his deposits.

{¶40} The first assignment of error is sustained.

### V. The Trial Court Used the Wrong Child-Support Worksheet

{¶41} In his second assignment of error, Brian argues that the trial court erred in calculating his child-support obligation when it used the computation worksheet for split-parental rights under former R.C. 3119.023, rather than the shared-parenting computation worksheet required under former R.C. 3119.022. He also challenges the trial court's failure to deviate from the statutory calculation based

13

on his parenting time under the shared-parenting plan, and its decision establishing Deborah's income for use on the worksheet.

{¶42} Generally, decisions regarding child support lie within the discretion of the trial court. *See Pauly v. Pauly*, 80 Ohio St.3d 386, 390, 686 N.E.2d 1108 (1997). However, the terms of R.C. 3109.04(A)(2) and former R.C. 3119.022 are mandatory and must be followed "literally and technically in all material respects." *See id.* at 389, quoting *Marker v. Grimm*, 65 Ohio St.3d 139, 601 N.E.2d 496 (1992), paragraph two of the syllabus; *see also Sapinsley v. Sapinsley*, 171 Ohio App.3d 74, 2007-Ohio-1320, 869 N.E.2d 702, ¶ 8 (1st Dist.).

{¶43} Former R.C. 3119.022, in effect at the time the trial court issued its amended decision, mandated the use of the shared-parenting computation worksheet when "a court * * * calculates the amount of child support to be paid pursuant to a child support order in a proceeding in which * * * the court issues a shared parenting order[.]" Where a trial court employs the wrong worksheet, it considers the wrong factors, and its ruling must be reversed. *See Miller v. Miller*, 1st Dist. Hamilton No. C-980892, 1999 WL 728553, *7 (Sept. 17, 1999) (holding that a shared-parenting worksheet was required to be used despite the parties' agreement that the split-parental rights worksheet should apply, because a shared-parenting plan was in place). A trial court must use the worksheet which corresponds with the parenting plan that it has ordered. *See Vanest v. Vanest*, 9th Dist. Summit No. 28498, 2017-Ohio-9302, ¶ 5.

{¶44} Here, the trial court's use of a split-parenting worksheet was inconsistent with its statement during the November 11, 2017 hearing that it was accepting the parties' jointly requested shared-parenting plan, and with its February 5, 2018 journalization of a "Final Decree of Shared Parenting." Thus the court erred in failing to employ a shared-parenting computation worksheet when it had issued a

14

shared-parenting decree. *See* former R.C. 3119.022; *see also Miller*, 1st Dist. Hamilton No. C-980892, 1999 WL 728553.

{¶45} Brian's next contention, that the trial court erred in failing to deviate from the statutory calculation based on his parenting time, is rendered moot by our holding that the trial court employed the wrong computation worksheet. *See* App.R. 12(A)(1)(c).

{¶46} Upon remand, the trial court's calculations will be governed by the provisions of H.B. No. 366. That legislation repealed the statutory split-parenting and shared-parenting worksheets found in former R.C. 3119.022 and 3119.023, and replaced them with standard worksheet forms issued by the director of Ohio Job and Family Services pursuant to Ohio's Administrative Procedure Act, R.C. Chapter 119, and R.C. 3119.021. The director was tasked with adopting rules governing the creation of new child-support worksheets for the calculation of child-support and cash-medical-support obligations. *See* Ohio Legislative Service Commission, H.B. 366 Bill Analysis, 132d General Assembly, 8.

{¶47} R.C. 3119.02 now provides that "In any action in which a court child support order is issued or modified, * * * the court or agency shall calculate the amount of the parents' child support and cash medical support in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119 of the Revised Code." Thus upon remand, the trial court will employ a new computation worksheet to determine the parents' child-support obligations.

{¶48} We also note that H.B. 366 changed the law governing deviations from the child-support obligations required under shared-parenting plans. R.C. 3119.24(B) no longer identifies "the amount of time the children spend with each parent" as an extraordinary circumstance that a court is required to consider before deviating from the amount of child support calculated pursuant to a shared-

parenting order. *See* Ohio Legislative Service Commission, H.B. 366 Bill Analysis, 132d General Assembly, at 18.

{¶49} Finally, we agree with Brian's assertion that the trial court abused its discretion in finding that "the parties generally agree on Debora[h]'s income of $60,000" because the record does not reflect such an agreement. Rather in his proposed child-support worksheet, Brian calculated that Deborah's income was $69,856. Deborah's own testimony and exhibits indicated that her income over the previous three years had averaged nearly $53,000. Thus we must find that the trial court abused its discretion in this determination. *See Marron*, 12th Dist. Warren No. CA2013-11-109, 2014-Ohio-2121, at ¶ 50.

{¶50} Because the trial court erred as a matter of law in failing to employ a shared-parenting worksheet as required by R.C. 3109.04(A)(2) and former R.C. 3119.022, and because it abused its discretion in establishing Deborah's gross income, we sustain the second assignment of error.

## VI. Conclusion

{¶51} The trial court's January 25, 2018 amended decision must be reversed in its entirety. In our resolution of the first assignment of error, we held that we cannot determine if the trial court applied the correct standards in determining that Brian was voluntarily underemployed or if its findings are supported in the record, and that the court erred in reaching its imputed-income determinations. We have also sustained Brian's second assignment of error as the trial court erred in calculating Brian's child-support amount by employing a split-parenting worksheet when it had adopted a shared-parenting plan.

{¶52} Therefore, we reverse the trial court's January 5, 2018 amended decision, and remand the matter for further proceedings consistent with law and this opinion.

*Judgment reversed and cause remanded.*

**MOCK, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

