[Cite as *Schwieterman v. Schwieterman*, 2020-Ohio-4881.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

MELISSA J. SCHWIETERMAN,

    PLAINTIFF-APPELLANT,          CASE NO. 8-19-49

    v.

LUKE R. SCHWIETERMAN,          O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Logan County Common Pleas Court
Family Court Division
Trial Court No. DR16-12-0184

**Judgment Affirmed**

**Date of Decision: October 13, 2020**

APPEARANCES:

    *John H. Cousins, IV* for Appellant

    *Andrew M. Engel* for Appellee

**WILLAMOWSKI, J.**

{**¶1**} Plaintiff-appellant Melissa J. Schwieterman ("Melissa") appeals the judgment of the Logan County Court of Common Pleas, Family Court Division, alleging the trial court erred in (1) calculating her income; (2) calculating the level of child support; (3) determining the date on which the marriage terminated; and (4) determining not to award spousal support. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{**¶2**} Melissa and Luke R. Schwieterman ("Luke") were married on June 9, 2001. Doc. 1. For the duration of this marriage, Luke worked for Cargill, Inc. Tr. 29. In between 2001 and 2003, Melissa worked as a registered nurse. Tr. 75-76. Around the time that their first child was born, Melissa stopped working full-time to focus on raising the children. Tr. 76-77. Two children were born as the issue of this marriage. Doc. 169. Tr. 45. Neither child had reached the age of majority by the time that trial court issued the divorce decree. Doc. 169. Tr. 35. Both children are enrolled in school. Tr. 87.

{**¶3**} From at least 2009 to the date of the divorce hearing, Melissa has worked part-time as a registered nurse for Columbus Exam One and then for Mobile Health Services. Ex. I. Tr. 63-64. In December of 2012, Melissa's grandparents gifted her $500,000.00. Tr. 97, 190. Ex. 2. Melissa placed around $400,000.00

from this gift into a Wells Fargo investment account. Tr. 190. She then deposited the remaining $100,000.00 in a joint checking account. Tr. 190. By April or May of 2015, roughly $68,000.00 remained in this joint account. Tr. 190-191. Melissa withdrew this sum of roughly $68,000.00 from this joint account and deposited these funds into a money market account. Tr. 190-191.

{¶4} On August 5, 2015, Melissa and Luke separated. Tr. 25. At this time, Luke moved out of the marital residence. Tr. 25, 102. In between August of 2015 and May of 2016, Luke would generally stay at the marital residence on weekends to accommodate his parenting time. Tr. 52, 103. In 2015, Melissa wrote a check that transferred $25,000.00 that she had withdrawn from the Wells Fargo investment account to her parents. Tr. 97, 197. Ex. 2. In 2016, she wrote two more checks that transferred $400,000.00 that she had withdrawn from the Wells Fargo investment account to her parents. Tr. 97. Melissa testified that these transfers, which totaled $425,000.00, were loans to her parents. Doc. 152. Tr. 98, 196-197. Ex. 2. By 2018, $104,158.33 remained in the Wells Fargo investment account. Ex. 2.

{¶5} On December 14, 2016, Melissa filed a complaint for divorce. Doc. 1. Tr. 44. Hearings on this matter were held on October 10 and 12, 2018. Doc. 163, 164, 170. The magistrate issued a decision on January 23, 2019. Doc. 152. Melissa then filed objections to the magistrate's decision on February 6, 2019. Doc. 156. The trial court issued a decree of divorce on September 16, 2019. Doc. 170. Melissa

filed her notice of appeal on October 16, 2019.  Doc. 179.  On appeal, she raises the following assignments of error:

**First Assignment of Error**

**The trial court erred, abused its discretion, and ruled against the manifest weight of the evidence by imputing $83,657.92 in additional income to Appellant for purposes of child support and spousal support.**

**Second Assignment of Error**

**The trial court abused its discretion in calculating child support.**

**Third Assignment of Error**

**The trial court erred, abused its discretion, and ruled against the manifest weight of the evidence by violating the parties' stipulated property division and determining that the marriage terminated on August 5, 2015.**

**Fourth Assignment of Error**

**The trial court abused its discretion by refusing to award spousal support for the parties' 18-year marriage.**

*First Assignment of Error*

{¶6} Melissa argues that the trial court erred by imputing $83.657.92 of income to her because (1) Luke failed to carry the burden of proving she was voluntarily underemployed and (2) because the trial court imputed income from income producing assets.

Legal Standard

{¶7} In deciding the issues relevant to child support orders, a trial court must consider the income of both parties. *See Drummer v. Drummer*, 3d Dist. Putnam No. 12-11-10, 2012-Ohio-3064, ¶ 24; *Arthur v. Arthur*, 3d Dist. Shelby No. 17-11-28, 2012-Ohio-1893, ¶ 25. *See* R.C. 3105.18(C)(1)(a). "The definition of 'income' as set forth in R.C. 3119.01 is intended to be both broad and flexible." *Misra v. Misra*, 2018-Ohio-5139, 126 N.E.3d 367, ¶ 32 (10th Dist.). R.C. 3119.01(C)(5) reads as follows:

> **"Income" means either of the following:**
>
> **(a) For a parent who is employed to full capacity, the gross income of the parent;**
>
> **(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent.**

R.C. 3119.01(C)(5). Thus, the applicable definition of income under R.C. 3119.01(C)(5) depends on a parent's employment status. R.C. 3119.01(C)(5).

{¶8} "[A] parent who claims that his or her former spouse is underemployed has the burden of proof on that issue." *Phyillaier v. Phyillaier*, 3d Dist. Shelby No. 17-98-21, 1999 WL 693157, *2 (Sept. 1, 1999). *See Groves v. Groves*, 12th Dist. Clermont No. CA2008-06-059, 2009-Ohio-931, ¶ 9. "[T]he question whether a parent is voluntarily * * * unemployed or voluntarily underemployed is a question of fact for the trial court." *Rock v. Cabral*, 67 Ohio St.3d 108, 112, 616 N.E.2d 218,

222 (1993). For this reason, a trial court's determination on this issue will not be disturbed unless the trial court is found to have abused its discretion. *Id.*

{¶9} If a trial court determines that a parent is voluntarily unemployed or voluntarily underemployed, the trial court computes that parent's income by adding that parent's potential income to any gross income he or she may have. R.C. 3119.01(C)(5). R.C. 3119.01(C)(5). *See Drummer* at ¶ 24; R.C. 3119.01(C)(17). "Gross income" is defined in R.C. 3119.01(C)(12). R.C. 3119.01(C)(12). This provision reads, in its relevant part, as follows:

> **(12) 'Gross income' means * * * the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, overtime pay, and bonuses * * *; commissions; royalties; tips; rents; dividends; severance pay; pensions; interest; trust income; annuities; social security benefits, including retirement, disability, and survivor benefits that are not means-tested; workers' compensation benefits; unemployment insurance benefits; disability insurance benefits; benefits that are not means-tested and that are received by and in the possession of the veteran who is the beneficiary for any service-connected disability * * *; spousal support actually received; and all other sources of income. 'Gross income' includes income of members of any branch of the United States armed services or national guard * * *; self-generated income; and *potential cash flow* from any source.**

(Emphasis added.) R.C. 3119.01(C)(12).

> **[O]ne of the purposes of the 'potential cash flow' provision in [the statute] * * * [is] to prevent a parent from avoiding child support obligations by shifting present income to a cash flow expected to be enjoyed at some future time, when the children have become emancipated.**

-6-

*Smart v. Smart*, 3d Dist. Shelby No. 17-07-10, 2008-Ohio-1996, ¶ 19, quoting

*Sizemore v. Sizemore*, 2d Dist. Montgomery No. 13673, 1994 WL 558917, *2 (Oct.

14, 1994).

{¶10} "Potential income" is defined in R.C. 3119.01(C)(17). R.C.

3119.01(C)(17). This provision reads as follows:

> **(17) 'Potential income' means both of the following for a parent who the court pursuant to a court support order, or a child support enforcement agency pursuant to an administrative child support order, determines is voluntarily unemployed or voluntarily underemployed:**
>
> **(a) Imputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria:**
>
> **(i) The parent's prior employment experience;**
>
> **(ii) The parent's education;**
>
> **(iii) The parent's physical and mental disabilities, if any;**
>
> **(iv) The availability of employment in the geographic area in which the parent resides;**
>
> **(v) The prevailing wage and salary levels in the geographic area in which the parent resides;**
>
> **(vi) The parent's special skills and training;**
>
> **(vii) Whether there is evidence that the parent has the ability to earn the imputed income;**
>
> **(viii) The age and special needs of the child for whom child support is being calculated under this section;**

**(ix) The parent's increased earning capacity because of experience;**

**(x) The parent's decreased earning capacity because of a felony conviction;**

**(xi) Any other relevant factor.**

**(b) Imputed income from any nonincome-producing assets of a parent, as determined from the local passbook savings rate or another appropriate rate as determined by the court or agency, not to exceed the rate of interest specified in division (A) of section 1343.03 of the Revised Code, if the income is significant.**

R.C. 3119.01(C)(17). Thus, by using the factors listed in R.C. 3119.01(C)(17)(a)(i)-(xi), the trial court is to determine "the income the voluntarily unemployed or voluntarily underemployed parent would have earned if fully employed * * *." *Huth v. Huth*, 11th Dist. Portage No. 2018-P-0084, 2019-Ohio-2970, ¶ 25.

{¶11} Further, under R.C. 3119.01(C)(17)(b), income may also be imputed from nonincome-producing assets (1) if the trial court determines that the parent is voluntarily unemployed or voluntarily underemployed and (2) if the income is significant. R.C. 3119.01(C)(17)(b). *See Sizemore, supra*, at *2. This imputed income is to be "determined from the local passbook savings rate or another appropriate rate as determined by the court, but not exceeding the statutory rate of R.C. 1343.03(A)." *Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 44.

{¶12} The amount of income to be imputed to a parent under R.C. 3119.01(C)(17) is a "matter[] to be determined by the trial court based upon the facts and circumstances of each case." *Cabral, supra*, at paragraph one of the syllabus. For this reason, appellate courts are to apply an abuse of discretion standard in reviewing a trial court's determination as to the amount of imputed income. *Id.* A mere error in judgment does not constitute an abuse of discretion. *Worden v. Worden*, 3d Dist. Marion No. 9-16-54, 2017-Ohio-8019, ¶ 26. Rather, a determination that is arbitrary, capricious, or unreasonable is an abuse of discretion. *Id.*

## Legal Analysis

{¶13} The first issue Melissa raises in this assignment of error is whether the trial court erred in finding that she was voluntarily underemployed. She asserts that Luke did not carry the burden of establishing that she was voluntarily underemployed. The record indicates that Melissa had an associate's degree from Rhodes State College and was licensed as a registered nurse. Tr. 46, 75-76. *See* R.C. 3119.01(C)(17)(a)(ii). In between 2001 and 2003, she stated that she worked forty hours a week as a full-time nurse, earning twenty dollars an hour. Tr. 75-76. She also worked overtime in this position. Tr. 76. Melissa affirmed that she stopped working as a full-time nurse "to stay home and raise kids * * *." Tr. 77. *See* R.C. 3119.01(C)(17)(a)(i).

{¶14} On cross-examination, Melissa testified that she does not work full-time hours at her current job at Care One Connect but that pays thirty dollars an hour. Tr. 81, 83. She stated that the number of hours she works a week varies by the number of clients that she has and that she has a degree of control over her work schedule. Tr. 86. While she did not know the average number of hours that she worked each week, she testified that she believed that she worked works an eight-hour day roughly four times a month. Tr. 85-86. However, she submitted an exhibit at trial that indicated she had worked 337.75 hours in between January 1, 2018 and October 14, 2018. Ex. F. *See* Tr. 48-50. Melissa also testified that she had earned $8,218.75 that year prior to the hearing. Ex. G. Tr. 81-83.

{¶15} Melissa testified that she inquired into a job opening at one hospital but did not submit an application. Tr. 80. She also personally knew one or two individuals who had the credentials that she did and were employed full-time in her area. Tr. 77-78. She stated that she did not know what her friends earned as full-time registered nurses. Tr. 78, 100. Melissa testified that many of the positions in her area would require a Bachelor of Science in Nursing Degree. Tr. 80. However, she also stated that she had not inquired into any positions that might be available to her with her current credentials in the central Ohio area. Tr. 80. She also indicated that her children were at the age where they were at school during the day. Tr. 87. *See* R.C. 3119.01(C)(17)(a)(viii).

{¶16} Melissa also agreed that she was in good physical, mental, and emotional health. Tr. 101. *See* R.C. 3119.01(C)(17)(a)(iii). However, she stated that she did not know if she planned to work as a full-time registered nurse in the future. Tr. 107. She testified that she was trying to get nurses to work for her at her current job so that she could assume a more supervisory role. Tr. 108. But she also indicated that she would probably not work forty hours a week even if she were able to attain this supervisory role. Tr. 108.

{¶17} Based on Melissa's testimony at the hearing, the trial court determined that Melissa had an annualized gross income of $11,795.88. Doc. 152. This was the equivalent of earning $205.47 per week. Doc. 152. At Melissa's hourly rate of pay, the magistrate calculated that Melissa was working, on average, roughly nine hours per week. Doc. 152.[1] Further, based on Melissa's statements at trial that she was mentally and physically healthy, the magistrate determined that she was capable of working forty hours a week and that she was, therefore, voluntarily underemployed. Doc. 152, 170.

{¶18} Thus, at the final hearing, there was evidence presented as to this issue that addressed several of the relevant factors listed in R.C. 3119.01(C)(17)(a). Tr. 77-86. The trial court could, in its discretion, conclude from this evidence that Melissa was voluntarily underemployed. Further, after reviewing the evidence in

---

[1] In making this calculation, the magistrate accounted for the fact that Melissa got a pay raise in the middle of 2018. Doc. 152.

-11-

the record, we do not find any indication that the trial court abused its discretion in reaching this determination. For these reasons, we find Melissa's first argument under this assignment of error to be without merit.

{¶19} We now turn to the second issue that Melissa raises under this assignment of error: whether the trial court properly considered the funds that Melissa received from her grandparents in determining Melissa's income. In this case, Melissa's grandparents gifted her $500,000.00. Tr. 108. She invested $400,000.00 of this sum in a Wells Fargo investment account. Tr. 96, 190. This account increased $74,856.77 in value in 2013; increased $40,186.60 in value in 2014; decreased $32,736.08 in value in 2015; and increased $36,051.26 in value in 2016. Ex. 2. Tr. 194-198. In 2015 and 2016, Melissa transferred $425,000.00 from this account to her parents. Tr. 98, 196-197.

{¶20} At the final hearing, Melissa testified that the transfers of $425,000.00 to her parents were loans for farm related expenses, life insurance, and cash rent. Tr. 98, 100, 142. However, Melissa testified that the terms of the loans to her parents had not been reduced to writing. Tr. 98. She also stated that the loans to her parents had no agreed upon repayment date and no agreed upon interest rate. Tr. 99, 100. Rather, Melissa testified that "a fair interest rate is all that's agreed upon." Tr. 99. She further testified that she wanted to make the same amount of money in interest from her parents that she would have made from the Wells Fargo

investment account. Tr. 100. Melissa did not withdraw all of the funds from this Wells Fargo investment account. Ex. 2. At the beginning of 2018, Melissa still had $104,158.33 in the Wells Fargo investment account. Ex. 2.

{¶21} Based on this information, the magistrate determined that potential income should be imputed to Melissa for the $425,000.00 loan from Melissa to her parents. Doc. 152. Using a five percent rate of return, the magistrate imputed $21,250.00 of potential income to Melissa from the loan to her parents. Doc. 152. The magistrate then used a five percent rate of return to calculate Melissa's "annual interest income" from the Wells Fargo investment account. Doc. 152. Thus, Melissa's income from the Wells Fargo investment account was $5,207.92. Doc. 152. On appeal, Melissa argues that the trial court erred (1) by considering the Wells Fargo investment account to be a nonincome-producing asset and (2) by imputing income to her from the $425,000.00 loan that she issued to her parents.

{¶22} In the first part of her argument, Melissa asserts that the trial court could not impute potential income from the Wells Fargo investment account pursuant to R.C. 3119.01(C)(17)(b) because it is an income producing asset. *See Sweeney v. Sweeney*, 2019-Ohio-1750, 135 N.E.3d 1189, ¶ 37 (1st Dist.). In the magistrate's decision, the Wells Fargo investment account was considered in the same analysis with the $425,000.00 loan as both were proceeds of the $500,000.00 gift. Doc. 152. However, there is no indication in the record that the trial court or

the magistrate considered the Wells Fargo investment account to be a nonincome-producing asset. Doc. 152. The magistrate never referred to the Wells Fargo investment account as a source of "potential income." Doc. 152. Using a five percent rate of return for the funds in the Wells Fargo investment account, the magistrate "imputed annual income of $5,207.92" to Melissa.[2] Doc. 152. The magistrate then referred to the calculated proceeds from the Wells Fargo investment account ($5,207.92 a year) as "annual interest income." Doc. 152. In contrast, the magistrate repeatedly referred to the $425,000.00 loan as a source of "potential income." Doc. 152. *See* R.C. 3119.01(C)(17)(b). Using a five percent rate of return on this loan, the magistrate determined that "$21,250.00 annually will be imputed to [Melissa] as 'potential income.'" Doc. 152.

{¶23} Thus, contrary to Melissa's assertion, the record does not indicate that the trial court considered the Wells Fargo investment account to be a nonincome-producing asset under R.C. 3119.01(C)(17)(b) that was a source of potential income. Doc. 152. Pursuant to R.C. 3119.01(C)(12), the trial court could impute income from the Wells Fargo investment account as a source of "potential cash flow" when calculating Melissa's gross income. R.C. 3119.01(C)(12). Based on a review of

---

[2] The use of the word "impute" in this context does not indicate that the trial court considered the annual interest income from the Wells Fargo investment account as "potential income" under R.C. 3119.01(C)(17) and does not imply that the magistrate considered the Wells Fargo account to be a nonincome-producing asset under R.C. 3119.01(C)(17)(b). "Courts do sometimes use the phrase 'imputed income' when referring to potential cash flow" in calculating gross income under R.C. 3119.01(C)(12). *Smart, supra*, at ¶ 25, quoting *Howell v. Howell*, 167 Ohio App.3d 431, 2006-Ohio-3038, 855 N.E.2d 533, ¶ 54 (2d Dist.).

the relevant materials in the record, this is exactly what the trial court appears to have done. Doc. 152.

{¶24} In the second part of her argument, Melissa argues that the $425,000.00 loan to her parents is not an asset from which the trial court can impute potential income to her under R.C. 3119.01(C)(17(b). However, this Court has interpreted the Second District's decision in *Sizemore v. Sizemore* as standing for the proposition that a loan can be a nonincome-producing asset. *See Smart, supra*, at ¶ 22, citing *Sizemore, supra*, at *3.[3] We will apply this understanding to the facts of this case.

{¶25} At the final hearing, Luke presented evidence that the Wells Fargo investment account was generating an average rate of return of 9.83% a year in between 2013 and 2019. Tr. 200. Ex. 2. Melissa testified that she withdrew $425,000.00 and issued these funds as loans to her parents. Tr. 98, 197. There is

---

[3] In *Sizemore*, the trial court considered a parent's $115,237.00 loan to his corporation as a nonincome-producing asset because this asset was not, at that time, producing income and because the parent expected a return on this loan in the future. *Sizemore, supra*, at *3. But the trial court did not make a finding that the parent was voluntarily underemployed or voluntarily unemployed. *Id*. Thus, on appeal, the Second District held that the trial court could not impute *potential* income from this asset in the absence of such a finding. *Id*. *See* R.C. 3119.01(C)(17)(b). However, the Second District held that the trial court could impute income from this loan as a source of *potential cash flow*. *Id*. *See* R.C. 3119.01(C)(12). In *Smart v. Smart*, this Court cited Sizemore as "finding that a loan to a corporation that was not generating income at the time, a nonincome-producing asset, constituted a potential cash flow and was treatable as gross income." *Smart, supra*, at ¶ 22. Thus, this Court operated under the assumption that the imputation of income as "potential cash flow" instead of "potential income" did not change the status of this loan as a nonincome-producing asset. *Id*. The Second District in *Howell v. Howell* exhibited a similar reliance on *Sizemore*. *See Howell v. Howell*, 167 Ohio App.3d 431, 2006-Ohio-3038, 855 N.E.2d 533, ¶ 51 (2d Dist.), citing *Sizemore, supra*, at *3. In the case before this Court, the trial court found that Melissa was voluntarily underemployed. Doc. 152, 170. Thus, pursuant to the reasoning in *Sizemore*, *Smart*, and *Howell*, the trial court could impute potential income to Melissa from this loan as a nonincome-producing asset. *See Sizemore, supra*, at *3; *Smart, supra*, at ¶ 22; *Howell, supra*, at ¶ 51.

no evidence in the record that Melissa was, by the time of the final hearing, receiving any interest payments on this loan from her parents. *See* Tr. 98-101. Thus, she chose to transfer this asset from an account that had been generating returns to a loan that was not, at that time, generating returns.

**{¶26}** The magistrate found that Melissa did not offer any testimony regarding "the actual need for her parents to have this money * * *" and that her testimony "was vague about her parent[s'] farming operation." Doc. 152. He noted that "[t]he optics of 'loaning' $425,000.00 to a relative or trusted friend immediately before or during a divorce proceeding is troubling. To do so and then request spousal support is even more so." Doc. 152. The magistrate then determined that "it [was] necessary to impute the 'potential income' this $425,000.00 could generate for [Melissa]." Doc. 152.[4] The trial court did not err in imputing potential income from the $425,000.00 loan that Melissa issued to her parents that was, at the time of the final hearing, not producing income. *See* R.C. 3119.01(C)(17)(b).

**{¶27}** Even if the trial court had erred in imputing potential income from this loan, these funds could still be imputed to Melissa's gross income as a source of potential cash flow under R.C. 3119.01(C)(12). In this case, Melissa indicated that

---

[4] While the funds in the Wells Fargo investment account were generating an average rate of return of 9.83% a year, the magistrate applied a five percent interest rate in the process of imputing income from the funds associated with this account. Ex. 2. Doc. 152, 170. The trial court found that the average rate of return of 9.83% in between 2013 and 2019 was too "speculative" a figure on which to impute potential income. Doc. 170.

she expected her parents to repay this loan at "a fair interest rate." Tr. 99. She further indicated that she would expect to receive roughly as much from the repayment of this loan as she would have received from the returns on the Wells Fargo investment account. Tr. 100. While this loan was not currently an income producing asset, Melissa indicated that she anticipated that this loan was going to be a source of income in the future as her parents repaid this loan. *See Sizemore, supra*, at *3 (holding that "[a] choice to defer income will not justify deferring or avoiding child support."). Thus, this loan would qualify as a source of potential cash flow under R.C. 3119.01(C)(12). *Id.*

{¶28} Nevertheless, we do not find any indication that the trial court erred in determining that Melissa was voluntarily underemployed. Further, after reviewing the evidence in the record, we conclude that the trial court did not err in imputing income to Melissa from the $104,158.33 in the Wells Fargo investment account. We further conclude that the trial court did not err considering the $425,000.00 loan from Melissa to her parents as a source of potential income and did not err in imputing income to Melissa from this nonincome-producing asset. For these reasons, Melissa's first assignment of error is overruled.

*Second Assignment of Error*

**{¶29}** Melissa argues that the trial court erred by ordering a level of child support that was less than the combined child support obligation in the absence of making one of the findings in R.C. 3119.04(B).

Legal Standard

**{¶30}** The version of R.C. 3119.04(B) that was in effect at the time of the filing of this action reads as follows:

> **If the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court, with respect to a court child support order, or the child support enforcement agency, with respect to an administrative child support order, shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court or agency determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, determination, and findings.**

R.C. 3119.04(B).[5]   Thus, "[t]he level of support for a combined gross income of $150,000 [is] the starting point from which a trial court exercises its discretion in

---

[5] In this case, the magistrate's decision was filed on January 23, 2019. Doc. 152. A revised version of R.C. 3119.04 became effective on March 28, 2019. R.C. 3119.04. The trial court order was issued on September 16, 2019. Doc. 170. In light of the recent decisions in *Graham v. Graham*, 2020-Ohio-1435, ---N.E.3d ---, ¶ 18 (3d Dist.) and *Sweeney v. Sweeney*, 2019-Ohio-1750, 135 N.E.3d 1189, ¶ 46 (1st Dist.), we requested

Case No. 8-19-49

fashioning a child support award for parents with higher incomes." *Pelger v. Pelger*, 3d Dist. Logan No. 8-18-36, 2019-Ohio-1280, ¶ 10, quoting *Kane v. Kane*, 9th Dist. Summit No. 26781, 2014-Ohio-2037, ¶ 13.

> **If the parties have a combined income exceeding $150,000, the child support guidelines do not apply. *Phelps v. Saffian*, 8th Dist. Cuyahoga No. 103549, 2016-Ohio-5514, 2016 WL 4497129, ¶ 9. Instead, R.C. 3119.04(B) states that if the combined income of the parties exceeds $150,000, the court must establish the amount of child support on a case-by-case basis, taking into consideration 'the needs and the standard of living of the children who are the subject of the child support order and of the parents.' R.C. 3119.04(B). Trial courts need not consider the deviation factors set forth in R.C. 3119.23 and 3119.24 when setting support amounts higher than the statutory amount for a combined gross income of $150,000 since '[s]upport awards in excess of that minimum * * * are anticipated by R.C. 3119.04(B) and are not deviations.' *Wuscher v. Wuscher*, 9th Dist. Summit No. 27697, 2015-Ohio-5377, 2015 WL 9393622, ¶ 27.**

*Guagenti v. Guagenti*, 2017-Ohio-2706, 90 N.E.3d 297, ¶ 75 (3d Dist.). "A trial court has considerable discretion related to the calculation of child support, and, absent an abuse of discretion, an appellate court will not disturb a child support order." *Clark v. Clark*, 3d Dist. Henry No. 7-15-09, 2015-Ohio-3818, ¶ 28.

Legal Analysis

**{¶31}** In this case, the magistrate determined that Melissa and Luke had a combined income of $224,500.63, which was $74,500.63 above the $150,000.00

---

supplemental briefs from the parties on the issue of whether the current or former version of R.C. 3119.04 should apply. In their briefs, both parties argued that no prejudice would arise from the application of the former version of R.C. 3119.04.

threshold in former R.C. 3119.04(B). Doc. 152. Luke's income represented roughly sixty-three percent of this combined income. Doc. 152. Melissa's income represented the remaining thirty-seven percent. Doc. 152. The magistrate began his calculations by noting that the level of child support for parents with a combined income of $150,000.00 is $21,971.00. Doc. 152.

{¶32} The final two combined income levels listed on the applicable statutory schedule in former R.C. 3119.021(A) were for combined incomes of $149,400.00 and $150,000.00. R.C. 3119.021(A). The child support obligation at $149,400.00 was $21,908.00, and the child support obligation at $150,000.00 was $21,971.00. R.C. 3119.021(A). Thus, while the combined income level increased by $600.00, the child support obligation increased by $63.00. The magistrate noted that this $63.00 increase in the child support obligation represented 10.5% of the $600.00 increase in the level of combined parental income. Doc. 152. The magistrate multiplied the amount of combined income that Luke and Melissa had above the $150,000.00 threshold ($74,500.63) by the rate of 10.5%, reaching the figure of $7,822.57. Doc. 152.

{¶33} The magistrate then added this $7,822.57 figure to the child support obligation for combined parental incomes of $150,000.00 on the statutory schedule. In the end, the magistrate determined that an overall child support obligation of $29,765.82 was appropriate for Luke and Melissa's children. Doc. 152. Because

Luke had roughly sixty-three percent of the combined parental income, he would be responsible for $18,763.05 of this amount, and Melissa would be responsible for the remaining $11,002.77. Doc. 152.

{¶34} However, since the parties agreed to a shared parenting plan in which the children spend equal time with each parent, the magistrate divided the amounts assigned to Luke and Melissa in half. Doc. 152. After this division, Luke owed Melissa $9,381.52, and Melissa owed Luke $5,501.38. Doc. 152. The magistrate then subtracted Melissa's obligation from Luke's obligation. Doc. 152. Of the annual child support obligation, Luke was required to transfer $3,880.14 to Melissa. Doc. 152.

{¶35} Melissa argues that the trial court erred by ordering an amount of child support that was lower than the minimum amount of $21,971.00 listed in the statutory schedule for combined incomes of $150,000.00. In particular, Melissa argues that the trial court erred by "arbitrarily divid[ing] Luke's child support obligation in half based on the division of parenting time." Appellant's Brief, 13. However, a careful reading of magistrate's calculations indicates that the trial court did not order a child support obligation that was lower than the statutory recommendation for combined incomes of $150,000.00. Further, the trial court also did not, in effect, divide Luke's child support obligation in half. We turn to examining the rationale of the magistrate's decision.

**{¶36}** In this case, the magistrate determined that Luke and Melissa's overall child support obligation should be $29,765.82 annually. Doc. 152. Since the children were to spend one half of the year with each parent, each household would need one half of this overall child support obligation or $14,882.19 to provide for the needs of the children. Since Melissa made roughly thirty-seven percent of the combined parental income, the magistrate expected her to be financially able to contribute thirty-seven percent of the overall child support obligation of $29,765.82. Thus, she was expected to contribute $11,002.77 a year to the support of her children while they were living with her.

**{¶37}** However, after her expected contribution of $11,002.77, Melissa would need an additional $3,880.14 for her household to reach the $14,882.19 level of support that was needed for the children during the one-half of the year that the children resided with her. For this reason, the magistrate ordered Luke to pay Melissa exactly $3,880.14. Doc. 152. Her expected annual contribution of $11,002.77 and Luke's $3,880.14 a year in child support payments give Melissa's household the expected $14,882.19 a year. Thus, the children can rely on a level of child support of $14,882.19 in Melissa's household while Melissa contributes thirty-seven percent of the annual, overall child support obligation.

**{¶38}** Under the magistrate's order, Melissa does not owe any child support payments to Luke. Doc. 152. Thus, in addition to making $3,880.14 in child

support payments, Luke is expected to furnish the entire $14,882.19 level of child support for his own household by solely supporting the children during the one-half of the year when they are living with him. In other words, by supporting the children while they are with him and by making child support payments to Melissa, Luke is expected to contribute a total of $18,763.05 in child support annually. This $18,763.05 is sixty-three percent of the annual, overall child support obligation of $29,765.82.

{¶39} The trial court's order anticipates that the children will receive a level of child support that is equivalent to $29,765.82 a year. The order anticipates that sixty-three percent of this total will come from Luke and that thirty-seven percent will come from Melissa. This overall child support obligation is more than the $21,971.00 in the statutory schedule for combined parental incomes of $150,000.00.[6] R.C. 3119.021(A). Further, contrary to Melissa's argument, the trial court did not divide Luke's child support obligation in half. Rather, in effect, the trial court divided in half the *amount in child support payments* that each party owes to the other to account for the fact that the children spend one half the year in each parental household. In so acting, the trial court did not cut in half what the parties owe to the children.

---

[6] In its judgment entry, the trial court indicated that it did not deviate down from the statutory schedule in issuing this order. Doc. 170. The trial court did, however, note that it could also reach this result through a deviation. Doc. 170. *See Borer v. Borer*, 3d Dist. Seneca No. 13-09-24, 2009-Ohio-6522, ¶ 5, 28.

{¶40} After evaluating the magistrate's reasoning, the trial court "caution[ed] that this method is only useful in situations where each party has substantial resources to properly care for the children." Doc. 170. In reaching this conclusion in its child support analysis, the trial court stated that "the Magistrate's finding that [Melissa] is underemployed is so clear that to argue otherwise * * * diminished credibility." Doc. 170. The trial court also considered the fact that Melissa had $425,000.00 to loan to her parents and noted that Melissa had previously been "earning $50,000.00 per year on her investment" before she transferred the $425,000.00 to her parents.

{¶41} Under former R.C. 3119.04(B), the trial court is permitted to determine "the amount of the obligor's child support obligation on a case-by-case basis" where "the combined gross income of both parents is greater than [$150,000.00] * * *." R.C. 3119.04(B). The trial court divided the child support obligation on the basis of the financial resources that each party had at their disposal and the amount of time that the children lived with each party. After reviewing the record, we do not find any indication that the trial court abused its discretion in making this determination. Thus, Melissa's second assignment of error is overruled.

*Third Assignment of Error*

{¶42} Melissa argues that the trial court erred by using August 15, 2019 as the date of termination for the marriage instead of the date of the final hearing.

Legal Standard

**{¶43}** The duration of a marriage provides a trial court with a timeframe for determining the value of marital assets that fluctuate in value. *See Rossi v. Rossi*, 8th Dist. Cuyahoga No. 100133, 2014-Ohio-1832, ¶ 29. An equitable distribution of marital assets relies on an equitable determination as to the duration of the marriage. *Heyman v. Heyman*, 10th Dist. Franklin No. 05AP-475, 2006-Ohio-1345, ¶ 31. R.C. 3105.171(A)(2) defines "during the marriage" as follows:

> **(a)   Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;**
>
> **(b)   If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, 'during the marriage' means the period of time between those dates selected and specified by the court.**

R.C. 3105.171(A)(2). Thus, this provision allows a trial court to recognize a de facto termination date for the marriage. *Shoenfelt v. Shoenfelt*, 3d Dist. Shelby No. 17-12-08, 2013-Ohio-1500, ¶ 15.

**{¶44}** Under R.C. 3105.171(A)(2)(a), "[t]here is a statutory presumption that the duration of a marriage runs from the date of the marriage through the date of the final divorce hearing." *Drummer, supra*, at ¶ 51, citing R.C. 3105.171(A)(2)(a). However, under R.C. 3105.717(A)(2)(b), "[i]f the court determines use of [the final

hearing] date would be inequitable * * *, it may select a termination date that it considers equitable." *Fernando v. Fernando*, 2017-Ohio-9323, 102 N.E.3d 657, ¶ 6 (10th Dist.).

{¶45} To comply with R.C. 3105.171(A)(2)(b), the trial court must engage in a two-step process in order to impose a de facto determination date. *Shoenfelt* at ¶ 19.

> **First, [the trial court] must consider whether using the final hearing date as the termination date of the marriage would be equitable. Second, if using the final hearing date would be inequitable, [the trial court] must determine, based on the * * * factors [set forth in *Dill v. Dill*, 179 Ohio App.3d 14, 2008-Ohio-5310, 900 N.E.2d 654, ¶ 47 (3d Dist.), that] a previous date that is both equitable to the parties and reasonable based on the evidence adduced at trial.**

*Id*. The nonexclusive list of factors in *Dill* are as follows:

> **(1) the parties separated on less than friendly terms, (2) the parties believed the marriage ended prior to the hearing, (3) either party cohabited with another person during the separation, (4) the parties were intimately involved during the separation, (5) the parties lived as husband and wife during the separation, (6) the parties maintained separate residences, (7) the parties utilized separate bank accounts or were/were not financially intertwined (with the exception of temporary orders), (8) either party attempted to reconcile, (9) either party retained counsel, and (10) the parties attended social functions together or vacationed together.**

(Citations omitted.) *Dill* at ¶ 11. "No one factor is dispositive; rather, the trial court must determine the relative equities on a case-by-case basis." *Id*., citing *Berish v. Berish*, 69 Ohio St.2d 318, 319-320, 432 N.E.2d 183 (1982).

> **In general, trial courts use a de facto termination of marriage date when the parties separate, make no attempt at reconciliation, and continually maintain separate residences, separate business activities, and separate bank accounts.** *Gullia v. Gullia* **(1994), 93 Ohio App.3d 653, 666, 639 N.E.2d 822. However, courts should be reluctant to use a de facto termination of marriage date solely because one spouse vacates the marital home.** *Day v. Day* **(1988), 40 Ohio App.3d 155, 158, 532 N.E.2d 201. Rather, a trial court may use a de facto termination of marriage date when the evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances.** *Id*.

*O'Brien v. O'Brien*, 8th Dist. Cuyahoga No. 89615, 2008-Ohio-1098, ¶ 41. *See Dill* at ¶ 11, quoting *Day* at 158 (holding that "[a] de facto termination of marriage must be 'clear and bilateral, not unilateral' * * *.").

{¶46} "R.C. 3105.171(A)(2)(b)'s language is discretionary, not mandatory * * *." *Dill* at ¶ 10. For this reason, "the trial court's decision of whether a de facto termination date is equitable is reviewed under an abuse-of-discretion standard." *Id*. "Under the abuse of discretion standard, an appellate court is not to substitute its judgment for the trial court's judgment." *Mousa v. Saad*, 3d Dist. Marion No. 9-18-12, 2019-Ohio-742, ¶ 29, citing *Schroeder v. Niese*, 2016-Ohio-8397, 78 N.E.3d 339, ¶ 7 (3d Dist.). Thus, a mere error of judgment does not rise to the level of an abuse of discretion. *Siferd v. Siferd*, 2017-Ohio-8624, 100 N.E.3d 915, ¶ 16 (3d Dist.). "[T]o constitute an abuse of discretion, the trial court's decision must be unreasonable, arbitrary, or capricious." *Southern v. Scheu*, 3d Dist. Shelby No. 17-17-16, 2018-Ohio-1440, ¶ 10.

Legal Analysis

**{¶47}** Melissa argues that the use of August 5, 2015 as the de facto termination date instead of the date of the final hearing affects the valuation of retirement accounts in Luke's name. First, she argues that the de facto termination date for the marriage violates the property division that was agreed to by the parties. Second, she argues that Luke's failure to file a motion for a de facto termination date renders the trial court's determination on this matter a violation of her rights to due process. Third, she argues, in the alternative, that the trial court erred by using a de facto termination date for the marriage instead of the date of the final hearing. Fourth, as part of her alternative argument, she further argues that the trial court failed to determine that the use of the final hearing date would be inequitable as is required by our decision in *Dill*. We will consider each of these four arguments in turn.

**{¶48}** As to the first argument, the parties to this action presented the magistrate with an agreement on the distribution of property at the final hearing on October 10, 2018. October 10 Tr. 1. Melissa's attorney read this agreement into the record and, in this process, stated the following:

> **They have reached an agreement on the retirement plans * * * they have agreed that husband has a separate property interest in the Vanguard partnership plan * * *. He's going to get that separate property interest prior to division of that—that retirement account.**

> **As you know, Your Honor, we have yet to decide as to the** *termination date of the marriage*, **but the parties have agreed that they're going to equally share the marital portion of that account 50/50. There is another account—I'm not quite sure how much is in it, but if there is an amount in it, they've agreed to the same terms for that account \* \* \*. It's a Cargill partnership plan \* \* \*. They've agreed to share the marital portion of that account 50/50.**

(Emphasis added.) *Id*. at 4-6.

{¶49} After hearing the terms of this arrangement, the magistrate conducted a colloquy to ensure that the parties were agreed as to the matters that were resolved and the matters that remained for trial. October 10 Tr. 12-14. The magistrate stated the following: "So that will take care of everything other than spousal [support], *date of termination of marriage*, child support \* \* \*." (Emphasis added.) *Id*. at 12. Melissa's attorney did not object to this statement and did not seek any further clarification. *Id*. at 12-14.

{¶50} On January 23, 2019, the magistrate issued a decision that incorporated the agreement between the parties as to the distribution of property. Doc. 152. Both Luke and Melissa had signed this document. Doc. 152. This agreement provided for the division of the retirement accounts and expressly stated that "[t]he court is to decide the end-date of the marriage." Doc. 152. Further, the magistrate's decision contained a stipulation that the termination date of the marriage was a matter that remained for the trial court to determine; that Melissa asserted the date of the final hearing should be the termination date; and that Luke

asserted the date of their separation should be the de facto termination date. Doc. 152.

{¶51} These facts in the record indicate that the trial court did not violate the stipulated agreement between the parties in issuing a determination as to the termination date of the marriage. In this case, both parties signed an agreement that submitted this issue to the trial court for determination. Doc. 152. The discussion at the final hearing and the stipulations in the magistrate's decision reflect the understanding of the parties. October 10, 2018 Tr. 4-6, 12. For this reason, the trial court's decision does not violate the agreement between the parties. Doc. 152. Rather, the decision of the trial court was made pursuant to the agreement between the parties. Doc. 152. Thus, Melissa's first argument is without merit.

{¶52} As to her second argument, Melissa fails to cite any legal authority that would suggest Luke, given the circumstances in this case, was required to file a motion that formally requested a de facto termination date for the marriage. The Supreme Court of Ohio held that,

> **[i]n order to do equity, a trial court must be permitted to utilize alternative valuation dates, such as the time of permanent separation or de facto termination of the marriage, where reasonable under the facts and circumstances presented in a particular case.**

*Berish, supra*, at 321, quoting *Lacey v. Lacey*, 45 Wis.2d 378, 173 N.W.2d 142 (1970). For this reason, Ohio courts have held that

**no motion is required for the trial court to consider the use of a de facto date. It is within the exercise of the court's equitable powers, as well as its statutory authority, for the trial court to declare and apply a date for the division of marital property.**

*Hornbeck v. Hornbeck*, 2019-Ohio-2035, 136 N.E.3d 966, ¶ 39 (2d Dist.), quoting *Heyman, supra*, at ¶ 35. Thus, Luke was not required to file a motion with the trial court that formally requested a de facto termination date for the marriage, and the trial court did not err in deciding this issue in the absence of such a motion.

{¶53} Further, Melissa does not identify any facts in the record that would indicate she was not on notice that this matter was an issue to be considered at the final hearing. She also does not argue that she did not have an opportunity to be heard on this matter. Rather, she signed an agreement that submitted this issue to the trial court for a decision. Doc. 152. Melissa also gave testimony that was relevant to determining the termination date of the marriage. Tr. 102-106. She also made arguments for her position to the trial court. Doc. 156. Thus, Melissa's second argument is without merit.

{¶54} Regarding her third, alternative argument, there is testimony from Luke and Melissa as to each of the ten factors listed in *Dill*. *Dill, supra*, at ¶ 11. First, Luke testified that he and Melissa separated on less than friendly terms. Tr. 185. He stated that, at the time Melissa asked him to move out of the marital residence on August 5, 2015, she brought up an earlier incident in which he took pictures of her private areas. Tr. 25, 67. Melissa alleged that Luke took these

pictures while she was asleep and without her consent, but Luke denied taking these pictures while she was asleep. Tr. 24, 66. Melissa even suggested to Luke that his decision to photograph her without her consent could be a criminal offense. Tr. 149.

{¶55} Luke further testified that he and Melissa committed minor criminal offenses in an incident between them in December of 2016. Tr. 183. He stated that he was subject to a restraining order in between December of 2016 and January of 2017 that prevented him from visiting with the children. Tr. 162. Luke also testified that one of Melissa's boyfriends approached him on two different occasions in a confrontational manner. Tr. 169-170. However, Melissa asserted that the separation had to be friendly if Luke continued to stay at the house on weekends for parenting time in between August of 2015 and May of 2016. Tr. 102.

{¶56} Second, while Melissa stated at the final hearing that her marriage lasted from "June of 2011 until [the] present," she also testified that she did not consider herself still married to Luke. Tr. 102. Luke testified that he believed that the marriage had ended prior to the time of the final hearing. Tr. 186. He further stated that he came to believe that the marriage was in peril prior to the date of separation. Tr. 186. Third, Luke and Melissa denied cohabiting with any other person after they separated. Tr. 104, 186. However, Luke and Melissa testified that they had dated other individuals. Tr. 104.

{¶57} Fourth, both parties stated that they had not been intimately involved with each other since the date of the separation. Tr. 104, 186. Melissa admitted to having been intimate with others since their separation. Tr. 104. Fifth, Luke testified that they had not lived as husband and wife since the date of their separation. Tr. 186. Sixth, both parties testified that they had each maintained separate residences since their separation. Tr. 105, 186. Luke only stayed at the marital residence on every other weekend to facilitate parenting time in between August of 2015 and May of 2016. Tr. 105, 186.

{¶58} Seventh, Melissa testified that she and Luke still had a joint bank account. Tr. 105. However, Luke testified that he opened his own checking account for his use at the time of their separation. Tr. 187. He testified that he only paid for one expense out of their joint checking account after they separated. Tr. 187. He explained that he had forgotten to set up an automatic payment for his car from his new checking account and that, as a result, this bill was inadvertently paid for out of their joint checking account. Tr. 187.

{¶59} Eighth, Melissa also admitted that she had no intention of reconciling with Luke after August 5, 2015 and that they never discussed reconciliation. Tr. 104. Luke testified that he had written a letter to Melissa within a week of their separation. Tr. 188. This letter indicated a desire to continue the marriage. Ex. D. Tr. 26. He stated the following at the final hearing about this letter:

> **Melissa said I was a terrible person and did all these mean things. I was in shock. And so I wrote a letter to apologize because at that point I wasn't aware of the extramarital affairs that had been going on; I wasn't aware that we were significantly in debt when I was made to believe that we were \* \* \* in a very good position financially, and once I found those things out then I realized that the marriage was over.**

Tr. 189. Luke also testified that he offered to attend marriage counseling but that Melissa had denied this request. Tr. 187. He stated that their meetings after their separation were about coming to terms for a potential dissolution. Tr. 187.

{¶60} Ninth, Melissa and Luke both retained counsel after their separation. Tr. 106, 189. Tenth, both of them also testified that they did not take vacations or attend social functions together as a couple after August 5, 2015. Tr. 106, 189. Melissa testified that they had gone to dinner at restaurants together but only to discuss the terms and conditions of their divorce. Tr. 104. She said that none of these meetings at restaurants involved discussions about reconciliation. Tr. 104. She further testified that they had attended some of the same sporting events separately and did not sit together. Tr. 148.

{¶61} As to the equity of using a de facto termination date for the end of the marriage, Luke argued that "[o]nce the marriage has been broken, the increased value of assets that are not acquired through the joint efforts of the parties but by the sole action of the respective party are non-marital." Doc. 170. He further argued

that "it would be inequitable to value and distribute assets when one party did nothing to contribute to their production." Doc. 166.

{¶62} In his decision, the magistrate listed the *Dill* factors and applied them to the testimony from Luke and Melissa at the final hearing:

> **In applying these factors to this case, the Court notes that the parties separated on less than friendly terms. Shortly after the separation, there was an incident between the parties that resulted in each party being charged with criminal offenses. In addition, both children refused to visit with father. The Court finds that mother contributed to this alienation. Also, one of mother's boyfriends confronted father with intent to initiate a fight.**
>
> **Plaintiff [Melissa] testified that she considered the marriage over when Defendant left.**
>
> **Both Parties dated other parties. Although neither party admitted cohabiting with another. Plaintiff admitted to hav[ing] multiple paramours since Defendant moved out.**
>
> **Both parties denied being intimately involved with each other during the separation.**
>
> **Both parties denied living as husband and wife during the separation.**
>
> **Both parties admitted that since August 5, 2015, they maintained separate residences.**
>
> **Both parties acknowledged that they utilized separate accounts and Plaintiff admitted and argued that the 'joint account' was, in fact, her non-marital account.**
>
> **Neither party attempted a reconciliation after the August 15 [sic], 2015 date. They had gone to marriage counseling prior to that date.**

**Both parties retained counsel and negotiated a separation agreement including an informal shared parenting plan.**

Doc. 152. Thus, the magistrate considered the circumstances of this case under the factors set forth in *Dill*. Doc. 152. *Dill, supra*, at ¶ 11. The trial court, in the divorce decree, adopted the magistrate's reasoning on this matter. Doc. 170. For these reasons, Melissa's third argument is without merit.

{¶63} As to her fourth argument, Melissa points to our prior decision in *Shoenfelt v. Schoenfelt* and argues that the selection of a de facto termination date is a two-step process. Appellant's Brief, 15, citing *Shoenfelt, supra,* at ¶ 19. First, the trial court must determine that using the date of the final hearing as the termination date of the marriage would be inequitable. *Shoenfelt* at ¶ 19. Second, if the use of the final hearing date would be inequitable, the trial court must then determine a de facto termination date that would be equitable. *Id.* Melissa argues that, in this case, the trial court engaged in the second step of this analysis but not the first.

{¶64} In *Shoenfelt*, the trial court properly conducted the first step of this analysis but failed to use the *Dill* factors in the second step of this analysis. *Shoenfelt* at ¶ 20, 26. Instead, the trial court relied on considerations that had little relevance to determining the date on which the marriage effectively terminated. *Id.* at ¶ 20. The trial court picked a de facto termination date that reflected the time at

which the marriage effectively ended, but a date that was "arbitrarily selected" by one of the parties. *Id*. at ¶ 7, 22. The trial court also overlooked a number of facts that suggested that the marriage, in fact, ended prior to the date that the trial court designated as the de facto termination date. *Id*. at ¶ 22.

{¶65} By contrast, in the case presently before this Court, the trial court's entire analysis revolved around the *Dill* factors. We have already delineated the findings that the trial court made pursuant to the *Dill* factors. In this case, the inequity of using the date of the final hearing is apparent from the findings that were made by the trial court in the process of applying the *Dill* factors. Doc. 152, 170. The trial court then determined a de facto date of termination that reflected when the marriage effectively ended. After reviewing the materials in the record, we do not find any indication that the trial court, in either step of this analysis, replicated any of the errors that were present in the *Shoenfelt* case. Thus, Melissa's fourth argument is also without merit.

{¶66} Having considered Melissa's four arguments against the de facto termination date, we conclude that she has not identified an error in the trial court's decision to use August 5, 2015 as the de facto termination date of the marriage. Further, after reviewing the materials in the record, we do not find that the trial court abused its discretion in making this determination. For these reasons, Melissa's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶67}** Melissa argues that the trial court erred in determining not to award her spousal support.

Legal Standard

**{¶68}** R.C. 3105.18 governs the award of spousal support in divorce cases. R.C. 3105.18. "'[S]pousal support' means any payment or payments to be made to a spouse or former spouse, or to a third party for the benefit of a spouse or a former spouse, that is both for sustenance and for support of the spouse or former spouse." R.C. 3105.18(A). "In divorce and legal separation proceedings, upon the request of either party and after the court determines the division or disbursement of property * * *, the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(B).

**{¶69}** An "award of spousal support is not based solely on the 'need' of the party * * *." *Welch v. Welch*, 3d Dist. Union No. 14-14-05, 2015-Ohio-1595, ¶ 18. Rather, the trial court must determine what is appropriate and reasonable under the following factors listed in R.C. 3105.18(C)(1):

> **(a)   The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;**
>
> **(b)   The relative earning abilities of the parties;**
>
> **(c)   The ages and the physical, mental, and emotional conditions of the parties;**

**(d)   The retirement benefits of the parties;**

**(e)   The duration of the marriage;**

**(f)   The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;**

**(g)   The standard of living of the parties established during the marriage;**

**(h)   The relative extent of education of the parties;**

**(i)   The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;**

**(j)   The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;**

**(k)   The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;**

**(l)   The tax consequences, for each party, of an award of spousal support;**

**(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;**

**(n)   Any other factor that the court expressly finds to be relevant and equitable.**

R.C. 3105.18(C)(1).

> '**Each of the factors under R.C. 3105.18(C)(1) relates, either directly or indirectly, to the obligee spouse's need or the obligor spouse's ability to pay support.'** *Abbott v. Abbott*, **6th Dist. Fulton No. F-06-020, 2007-Ohio-5308, ¶ 78. Accordingly, 'a spousal support award must balance the obligee's need for support against the obligor's ability to pay.'** *Tremaine v. Tremaine*, **111 Ohio App.3d 703, 707[, 676 N.E.2d 1249] (2d Dist. 1996).**

*Roychoudhury v. Roychoudhury*, 3d Dist. Union No. 14-14-19, 2015-Ohio-2213, ¶ 19. "Trial courts have broad discretion concerning an award of spousal support, and therefore, a trial court's decision will not be reversed absent an abuse of discretion." *Rodriguez v. Rodriguez*, 3d Dist. Mercer No. 10-13-15, 2013-Ohio-5663, ¶ 12.

Legal Analysis

{¶70} Melissa argues that the trial court abused its discretion in determining not to award her spousal support. In this case, the trial court adopted the magistrate's decision. The record indicates that the magistrate considered each of the factors listed in R.C. 3105.18(C)(1). Doc. 152, 170. Regarding the income of the parties, Luke was projected to earn a total of $132,459.00 in 2018. Tr. 13. Melissa testified that she earned thirty dollars an hour at her current, part-time job. Tr. 81. In October of 2018, Melissa reported that she had year-to-date earnings of $8,218.75. Tr. 81.

{¶71} However, in his decision, the magistrate had previously determined that this was the level of income that Melissa had earned while she was voluntarily underemployed. Doc. 152. *See* R.C. 3105.18(C)(1)(a). The magistrate determined

that Melissa did not have the same earning potential as Luke. Doc. 152. The record indicates that Melissa did spend a portion of the marriage as a homemaker but that she was still able to work part-time as a registered nurse. Tr. 77, 81. Ex. I. Doc. 152. *See* R.C. 3105.18(C)(1)(b).

{¶72} Based on the statements of the parties at the final hearing, the magistrate concluded that both parties were mentally and physically able to work. Doc. 152. Tr. 101, 182. *See* R.C. 3105.18(C)(1)(c). The record indicates that Luke had two retirement plans that had a value of $695,000.00 in August of 2015. Doc. 152. Under the magistrate's decision, Melissa was entitled to one half of the value of these retirement plans. Doc. 152. She also had a premarital retirement account that had a value of $12,700.00 but did not have a pension plan. Tr. 101, 144. Ex. E. Doc. 152. *See* R.C. 3105.18(C)(1)(d).

{¶73} Further, using the de facto termination date for the marriage, Luke and Melissa were married for fourteen years. Tr. 102, 148, 185. Doc. 152. *See* R.C. 3105.18(C)(1)(e). There was no evidence in the record that Melissa could not work outside of the home because of the needs of the children. Both of the children were enrolled in school. Tr. 167-168. Luke also testified that there were no daycare costs at this point. Tr. 159. The magistrate noted that the parties were to share time with the children equally. Doc. 152. *See* R.C. 3105.18(C)(1)(f).

{¶74} The magistrate found that both parties had enjoyed a "very comfortable" standard of living during the marriage. Doc. 152. The record indicates that, in between February 2017 and the divorce hearing, Luke voluntarily paid Melissa $1,000.00 a month. Tr. 51-52, 183. The magistrate found that Melissa was able to enjoy "a stable financial condition" during the period between their separation and the final hearing on this matter. Doc. 152. *See* R.C. 3105.18(C)(1)(g).

{¶75} As to education, Melissa had an associate's degree, and Luke had a high school diploma. Tr. 75. Doc. 152. *See* R.C. 3105.18(C)(1)(g). There is no indication in the record that either party contributed to the education of the other party to this action. Doc. 152. *See* R.C. 3105.18(C)(1)(j). Further, prior to the final hearing, the parties had already agreed to a division of their various marital assets and liabilities. Doc. 152. Ex. E. *See* R.C. 3105.18(C)(1)(i).

{¶76} The magistrate also noted that Melissa had not adjusted her work practices in between the date of their separation and the time of the final hearing. Doc. 152. Her income was roughly the same across the years from 2009 to 2018 even though she had filed for a divorce in 2016. Ex. I. Doc. 1, 152. The record does not indicate that she sought employment opportunities that would offer her a higher level of income, though the record did indicate that she had work experience as a registered nurse. Tr. 75-76, 81. Doc. 152. Melissa did testify that having a

Bachelor of Science in Nursing would have given her more opportunities. Tr. 80. However, the magistrate noted that Melissa did not use the time in which Luke was paying her $1,000.00 a month to obtain such a degree. Doc. 152. *See* R.C. 3105.18(C)(1)(k).

{¶77} The magistrate found that there were no tax consequences for either party for an award of spousal support and found that there was no testimony that Melissa lost any earning potential because of her marital responsibilities. Doc. 152. *See* R.C. 3105.18(C)(1)(l-m). The magistrate also found Melissa's decision to loan her parents $425,000.00 in the year following her separation from Luke to be "suspect." Doc. 152. The magistrate found that the details about the repayment of this loan to be "vague"; that there were no written documents that memorialized the terms of this loan; and that Melissa's ability to make loans that totaled $425,000.00 "mitigates against granting spousal support." Doc. 152. *See* Tr. 99-100. *See* R.C. 3105.18(C)(1)(k).

{¶78} In its judgment entry, the trial court adopted the magistrate's reasoning on the issue of spousal support. Doc. 170. In overruling Melissa's objection to the magistrate's decision on spousal support, the trial court found that her ability to earn $30.00 an hour as a registered nurse and that her ability to transfer $425,000.00 to her parents were indications that an award of spousal support was not appropriate in this case. Doc. 170.

{¶79} The divorce decree and the magistrate's decision indicate that the trial court considered the factors listed in R.C. 3105.18(C)(1). Doc. 152, 170. There was evidence presented at the final hearing that supported the trial court's findings. Further, after reviewing the evidence in the record, we do not find that the trial court abused its discretion in deciding not to award spousal support to Melissa. *See Sovern v. Sovern*, 3d Dist. Union No. 14-16-09, 2016-Ohio-7542, ¶ 80-81. Thus, Melissa's fourth assignment of error is overruled.

*Conclusion*

{¶80} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Logan County Court of Common Pleas, Family Court Division is affirmed.

***Judgment Affirmed***

**SHAW, P.J. and ZIMMERMAN, J., concur.**

**/jlr**