[Cite as *Krasik v. Newstate*, 2022-Ohio-1775.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| ELLEN F. KRASIK, | : | APPEAL NO. C-210457 |
| | | TRIAL NO. P18-708Z |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| | : | |
| HOWARD NEWSTATE, | | |
| Defendant-Appellant. | : | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 27, 2022

*Stagnaro Hannigan Koop, Co., LPA,* and *Michaela M. Stagnaro*, for Plaintiff-Appellee,

*Thomas S. Sapinsley*, for Defendant-Appellant.

**BERGERON, Judge.**

{¶1}    In this child support dispute, plaintiff-appellee Dr. Ellen F. Krasik filed a complaint for child support against her son's father, defendant-appellant Howard Newstate, after he essentially abandoned the child.  After the trial court granted a judgment in Dr. Krasik's favor, Mr. Newstate appealed, raising five assignments of error challenging the calculation of child support.  Based on the arguments presented on appeal, we overrule Mr. Newstate's assignments of error, and we affirm the judgment of the trial court.

I.

{¶2}    In June 2016, roughly two weeks after H.K. was born, Dr. Krasik and Mr. Newstate separated.  They had lived together for around one year at the time, but they never married.  Mr. Newstate insists that Dr. Krasik kicked him out, whereas Dr. Krasik testified that Mr. Newstate broke off the relationship months earlier.  Regardless, Mr. Newstate has not seen H.K. since then and he has provided practically no financial support to the child at all (although he did carry H.K. on his health insurance until 2017).

{¶3}    Mr. Newstate has a background in marketing, communications, and technology.  From 2014 until 2016, Mr. Newstate worked with Cedar Fair Entertainment Company, earning around $90,000 per year.  Mr. Newstate voluntarily left his position with Cedar Fair in 2017 after receiving an offer from Holovis International Ltd. (a UK based company) with a $90,000 base salary (along with a $16,000 bonus).  Mr. Newstate's time with Holovis proved to be short lived, however, as they parted ways in 2018.  Mr. Newstate took up independent contracting in 2018, and earned $77,117 on independent contracts that year.  Mr. Newstate's federal income tax return shows that he earned $98,699 in 2018 (combining his independent contracting income with his work for Holovis).

{¶4}    Towards the end of 2018, however, Mr. Newstate elected to embark on a nomadic lifestyle, travelling the world in an RV with his then-girlfriend (whom he married in

June 2019). During this time, Mr. Newstate and his wife formed a corporation offering remote marketing and communication services. In 2019, during the first full year of this venture, Mr. Newstate's gross income hovered around $20,000, and his household income approached $90,000. Mr. Newstate testified that he expected to make around $40,000 in 2020.

{¶5} On the other hand, Dr. Krasik has worked as a pathologist since 2013. In 2016, the year H.K. was born, Dr. Krasik was employed at Greater Cincinnati Pathologists Inc. with a total income of $221,628. In 2017, she transitioned to St. Elizabeth Medical Center, earning $79,539 from Greater Cincinnati and $179,571 from St. Elizabeth that year. She remained with St. Elizabeth in 2018 and 2019, earning $333,034 and $337,738 respectively. As of trial, her current salary was $386,000, but she expected to make at least $401,000 including bonuses.

{¶6} Dr. Krasik met Dr. Royce Calhoun, her current husband, a little less than a year after H.K. was born. They married in October 2018. Dr. Calhoun is a thoracic surgeon who expected to earn around $700,000 in 2020. Pursuant to a prenuptial agreement between the couple, they equally divide expenses, but Dr. Calhoun is absolved from any responsibility for H.K.'s financial needs—instead, Dr. Krasik shoulders that obligation. Consistent with their agreement, Dr. Calhoun testified that he has not made significant financial contributions to H.K.'s care at any time.

{¶7} Based on her demanding work schedule (with sometimes inconsistent hours), Dr. Krasik has employed a nanny for H.K. since 2016. She was solely responsible for paying the nanny's wages until September 2019, when she and her husband had a daughter. Now she and her husband share these costs equally. The trial court found that the nanny earned $36,106 in 2017, $39,711 in 2018, and $39,143 in 2019.

3

{¶8} In April 2018, Dr. Krasik filed a complaint against Mr. Newstate for child support. The trial court ultimately granted judgment in Dr. Krasik's favor, setting the support order at monthly amounts of $913.84 for 2016, $825.92 for 2017, and $1,522.98 for 2018. The trial court found that Mr. Newstate was voluntarily underemployed in 2019 and 2020, and imputed an $80,000 income to him for those years. Thus, from January 1, 2019 through March 27, 2019, the court set the support order at $1,279.14. After new child support worksheets came into effect, the support order decreased to between $587.78 and $593.44 for the remainder of 2019. For 2020 and beyond, the trial court set the support order at $559.62. The trial court also set an order on the arrearage of $200 per month.

{¶9} Mr. Newstate's appeal followed, in which he (1) challenges the finding that he was voluntarily underemployed in 2019 and 2020, (2) posits that the trial court failed to consider the needs and standard of living of H.K. when granting the support order, (3) maintains that the trial court should have considered employer contributions to Dr. Krasik's retirement account as part of her gross income, (4) insists that the trial court erred as a matter of law by including H.K.'s nanny's salary in the child support computation, and (5) contends that the trial court should have granted a downward deviation of the support order in light of Dr. Krasik's household income.

II.

{¶10} Mr. Newstate's first assignment of error challenges the trial court's finding of voluntary underemployment in 2019 and 2020, thus imputing a potential income of $80,000 to him for those years.

{¶11} "In calculating child support, a trial court must first determine the annual income for each parent." *Sweeney v. Sweeney*, 2019-Ohio-1750, 135 N.E.3d 1189, ¶ 24 (1st Dist.). "Income * * * for a parent who is unemployed or underemployed" is equal to "the sum of the gross income of the parent and any potential income of the parent." R.C.

3119.01(C)(9)(b). Potential income includes imputed income that the parent would have earned if fully employed based on the factors set forth in R.C. 3119.01(C)(17). When determining whether a parent is voluntarily underemployed, "[t]he test is not only whether the change was voluntary, but also whether it was made with due regard to the parent's income-producing abilities and his duty to provide for the continuing needs of the children. * * * The record must demonstrate an objectively reasonable basis for reducing employment income, where reasonableness is measured by examining the effect of the parent's decision on the interests of the child." *Sweeney* at ¶ 27, citing *Aldo v. Angle*, 2d Dist. Clark No. 09-CA-103, 2010-Ohio-2008, ¶ 35.

{¶12} We review the trial court's determination that a parent is voluntarily underemployed, and imputation of income to that parent, for an abuse of discretion. *Rock v. Cabral*, 67 Ohio St.3d 108, 112, 616 N.E.2d 218 (1993) ("[T]he question whether a parent is voluntarily (*i.e.*, intentionally) unemployed or voluntarily underemployed is a question of fact for the trial court. Absent an abuse of discretion, that factual determination will not be disturbed on appeal."); *Sweeney* at ¶ 26 ("The question of whether a parent is voluntarily underemployed is a question of fact for the trial court which will not be disturbed on appeal absent an abuse of the court's discretion.").

{¶13} Mr. Newstate begins by arguing that the R.C. 3119.01(C)(17) factors do not support imputing an $80,000 income to him. In particular, he insists that his prior work experience does not establish that he can earn $80,000 on a consistent basis because he has never earned more than $80,000 from a single employer. To the contrary, the record reflects that his annual income exceeded $80,000 for every year between 2014 and 2018—save for 2017 when he earned around $47,000 after voluntarily resigning from Cedar Fair in the beginning of the year and starting at Holovis midway through the year. Although he may not have earned more than $80,000 in 2018 from a single employer, his total compensation that

year exceeded that amount (which includes the commencement of his work as an independent contractor). Mr. Newstate insists that his industry is volatile, which, in his view, undermines any conclusion that he could make $80,000 if he sought employment in the field. But we see nothing in the record to support this claim—in fact, he made at least $80,000 consistently until he decided to embark on a nomadic lifestyle. Based on the record at hand, particularly evidence of Mr. Newstate's prior work experience, we do not believe the trial court abused its discretion by finding that his potential income was $80,000.

{¶14} Next, Mr. Newstate proclaims that he was not voluntarily underemployed at all because Holovis forced him to resign from his last job in 2018. Even if we assume that's true, the trial court only imputed income to Mr. Newstate for 2019 and 2020, which gave him several months to find replacement employment after leaving Holovis. In fact, Mr. Newstate succeeded in finding new sources of income, ultimately earning about $77,000 on independent contracts during the balance of 2018. Instead of remaining an independent contractor or seeking replacement employment, Mr. Newstate voluntarily launched his own business while touring the world in an RV, which resulted in a steep reduction in income. On these facts, the trial court did not abuse its broad discretion in finding that Mr. Newstate's decision to run his own business from the back of his RV constituted a voluntary reduction in income.

{¶15} Finally, Mr. Newstate asserts that, consistent with *Sweeney*, any voluntary reduction in income he incurred was objectively reasonable and made with due regard to his income producing abilities as well as his duty to provide for H.K. Mr. Newstate concedes that starting his own business carried a risk of reduced income, but he stresses that the reduction in income is likely temporary because businesses are often unprofitable initially as they get off the ground. According to Mr. Newstate, in light of his skillset and experience, it was

reasonable for him to accept a temporary reduction in income with the probability that he will surpass his previous earnings once the business gets established.

{¶16} The trial court rejected this argument, recognizing that travelling the world while running a small business might be an appealing lifestyle for many, but concluding that Mr. Newstate's desire to pursue this lifestyle did not obviate his duty to his child. We do not believe that the trial court abused its discretion in this respect. Starting a business could certainly be a reasonable career change under some circumstances. But where a parent quits steady and well-paying jobs to start a business from the back of an RV in the midst of a worldwide odyssey, such a career change becomes more difficult to reconcile with his responsibilities to his child. We reject Mr. Newstate's argument that *Sweeney* precludes a finding that he was voluntarily underemployed.

{¶17} The trial court did not abuse its discretion by determining that Mr. Newstate was voluntarily underemployed, and imputing an $80,000 income to him. We overrule his first assignment of error.

III.

{¶18} Next, Mr. Newstate argues that the trial court violated former R.C. 3119.04(B), which required the trial court to consider the needs and standard of living of the child subject to the support order if the parents' combined income exceeded $150,000. We review the trial court's assessment under R.C. 3119.04(B) for abuse of discretion, but "the failure to consider 'the needs and the standard of living of the children who are the subject of the child support order and of the parents,' * * * constitutes an abuse of discretion." *Strimbu v. Strimbu*, 11th Dist. Trumbull No. 2010-T-0104, 2011-Ohio-3629, ¶ 14, quoting former R.C. 3119.04(B). However, "there is no requirement to make findings to support an order above the base amount pursuant to R.C. 3119.04(B)." *Reik v. Bowden*, 172 Ohio App.3d 12, 2007-Ohio-2533, 872 N.E.2d 1253, ¶ 26 (1st Dist.).

{¶19} Here, the trial court expressly stated that it had considered both the needs and standard of living of the parties. The trial court explained that while Dr. Krasik has a high standard of living, Mr. Newstate also has quite a high standard of living. The trial court emphasized Mr. Newstate's extensive travelling, the hefty fee he paid for his engagement ring, and the significant charges to his credit cards (thousands of dollars each month), but he pays off the balance on a monthly basis. In other words, money is materializing from somewhere in a way incompatible with someone earning $20,000 to $40,000 annually.

{¶20} Mr. Newstate nevertheless maintains that the support order is excessive in light of Dr. Krasik's annual household income, which exceeds $1 million. According to Mr. Newstate, since H.K. lives in such a wealthy household, the support order imposed is unnecessary to satisfy H.K.'s needs and standard of living. But Mr. Newstate ignores the fact that Dr. Krasik has been solely responsible for H.K.'s financial needs since 2016. Although Dr. Krasik's household income exceeds $1 million, her share of that is considerably less, and her spouse does not provide for H.K.'s financial needs. Under these circumstances, we see no basis for interfering with the trial court's judgment on a question that is committed to its sound discretion. We overrule Mr. Newstate's second assignment of error.

IV.

{¶21} Mr. Newstate's third assignment of error contends that the trial court erred by failing to include employer contributions to Dr. Krasik's retirement account as part of her annual income. Dr. Krasik's employer contributes between $18,000 and $19,000 to her retirement account on an annual basis.

{¶22} The parties contest whether contributions to a retirement account are, as a matter of law, part of one's gross income for child support purposes. R.C. 3119.01(C)(12) defines gross income as "the total of all earned and unearned income from all sources during a calendar year * * * and includes income from salaries, wages, overtime pay, and bonuses *

* * commissions; royalties; tips; rents; dividends; severance pay; pensions; interest; trust income; annuities; social security benefits, including retirement, disability, and survivor benefits that are not means-tested; workers' compensation benefits; unemployment insurance benefits; disability insurance benefits; * * * and all other sources of income."

{¶23} Mr. Newstate relies on *Stamm v. Stamm*, 6th Dist. Fulton No. F-08-009, 2009-Ohio-4924, ¶ 20, where the Sixth District held that the statutory definition of gross income "has been interpreted to include income generated in IRA accounts and other retirement accounts even before such income is actually distributed to the account holder." *Id.*, citing *Albertson v. Ryder*, 11th Dist. Lake No. 91-L-103, 1992 Ohio App. LEXIS 3424 (June 30, 1992); *Pelikan v. Pelikan*, 8th Dist. Cuyahoga No. 62962, 1993 Ohio App. LEXIS 3379 (July 1, 1993). The *Stamm* court subsequently held that the trial court did not abuse its discretion in treating undistributed IRA, pension, and profit sharing income as gross income for the purposes of calculating a parent's child support obligation. *Stamm* at ¶ 20.

{¶24} But *Stamm* merely held that income generated *within* the account was gross income, but did not say that the employer contribution itself constituted gross income. In fact, several Ohio courts have rejected the claim that employer contributions to a retirement account qualify as gross income. For example, in *Guertin v. Guertin*, 10th Dist. Franklin No. 97APF09-1264, 1998 Ohio App. LEXIS 2838, *8 (June 23, 1998), the Tenth District held that an employer's $30,000 contribution to a corporate pension fund on behalf of the employee did not constitute gross income because "contributions on [his] behalf are not available to him as disposable income." The *Guertin* court reasoned that "[s]ince employer contributions to a pension fund are not expressly named in or excluded from the list of what gross income includes, this court will not disturb the trial court's finding that OSAC's contributions to the pension fund are not gross income absent an abuse of discretion." *Id.* at *6-7. The Fifth District has followed *Guertin* to hold that an employer's contributions to pension, annuity,

and apprenticeship funds did not constitute gross income. *Beiers v. Phillips*, 5th Dist. Licking No. 08CA0127, 2009-Ohio-3278, ¶ 64.

{¶25} Moreover, in *Lyons v. Bachelder*, 5th Dist. Morrow No. 2004-CA-0018, 2005-Ohio-4887, ¶ 27, the Fifth District recognized that "[n]ormally, a court would not consider any money contributed by an employer into an employee's pension plan as income." (Emphasis deleted.) However, the Fifth District ultimately held that, where the appellee was a self-employed doctor who could "decide for himself how much income to pay into his pension plan," the trial court had the discretion to deem half of the money placed in his pension plan to be income. *Id.* The *Lyons* court cited *Nicholson v. Nicholson*, 8th Dist. Cuyahoga Nos. 78595 and 78756, 2001 Ohio App. LEXIS 3973, *10 (Sep. 6, 2001), to support its reasoning. *Id.* at ¶ 26. In that case, the Eighth District held that "it is clear that [the former child support statute] specifically includes pensions within the items constituting income but excludes those payments made from the employer to the obligor. Thus the trial court acted well within its discretion in determining that one half of the pension payments were income." *Id.*

{¶26} Since *Stamm* is inapposite, and because Ohio courts have consistently rejected the argument that employer contributions to retirement accounts are gross income for child support purposes, we overrule Mr. Newstate's third assignment of error.

V.

{¶27} For his fourth assignment of error, Mr. Newstate attacks the reasonableness of Dr. Krasik's decision to employ a nanny, insisting that the nanny's salary should be excluded for the purposes of calculating his support obligation. The parties agree that this theory only applies to childcare expenses incurred prior to March 2019, when new child support worksheets came into effect. The former child support worksheets provided "for a downward adjustment to the income of the residential parent for annual child care expenses that are

work-related,          'as          approved          by          the          court.'          "
*Daufel v. Daufel*, 2d Dist. Montgomery No. 22584, 2008-Ohio-3868, ¶ 35, quoting former R.C. 3119.022.   However, a party claiming these expenses must "show how and why the expenses she claimed are reasonable."  *Id.* at ¶ 38.  We apply an abuse of discretion standard when assessing the trial court's decision to include childcare expenses as part of the child support calculation.  *See Powers v. Powers,* 1st Dist. Hamilton Nos. C-070293 and C-070297, 2008-Ohio-3159, ¶ 10.

{¶28}  The trial court found that the nanny's salary constitutes a reasonable childcare expense because Dr. Krasik works long, unpredictable hours.  Mr. Newstate counters by depicting a nanny as a luxury, rather than a reasonable childcare expense.  He analogizes this case to *Kenney v. Carroll*, 2017-Ohio-354, 83 N.E.3d 224, ¶ 34 (9th Dist.), where the Ninth District affirmed the trial court's decision not to include a nanny's salary in the calculation of a child support obligation.  But the *Kenney* court did not hold that a nanny's salary constitutes an unreasonable childcare expense as a matter of law; it merely recognized the trial court's discretion to determine that a nanny's salary was an unreasonable expense under the circumstances.  *See id.* ("Accordingly, as the trial court here did not conclude that nanny's salary was a reasonable daycare expense, we cannot say that the trial court was unreasonable, arbitrary, or unconscionable * * *.  Therefore, to the extent that Mother argues that the trial court erred in failing to include an amount for her daycare expenses in the child support calculation, her fourth assignment of error is overruled.").  Just like in *Kenney*, here the trial court possessed discretion to determine the reasonableness of the nanny's salary as a childcare expense under the circumstances.  And the trial court acted within its sound discretion when it determined that, under these circumstances, the nanny's salary constituted a reasonable childcare expense because it enabled Dr. Krasik to work the demanding hours

that her job required in order to provide for H.K. (particularly when Mr. Newstate was not contributing anything). We overrule Mr. Newstate's fourth assignment of error.

## VI.

{¶29} Finally, Mr. Newstate argues that the trial court abused its discretion by failing to grant a downward deviation from the child support obligation in light of Dr. Krasik's household income. R.C. 3119.22 permits a trial court to deviate from the amount of child support that results from using the basic child support schedule and/or worksheet. The trial court assesses numerous factors under R.C. 3119.23 when deciding whether to grant a downward deviation. We review the trial court's decision to grant, or not grant, a deviation under R.C. 3119.23 for an abuse of discretion. *See Rummelhoff v. Rummelhoff,* 1st Dist. Hamilton Nos. C-210112 and C-210176, 2022-Ohio-1224, ¶ 19.

{¶30} Here, the trial court declared that it had considered the R.C. 3119.23 factors to determine that a downward deviation was not in H.K.'s best interest. The trial court ultimately found that Dr. Krasik's household income did not provide a basis for a downward deviation because Dr. Krasik's spouse does not provide financial support for H.K. under their prenuptial agreement. Mr. Newstate provides scant analysis explaining how the trial court abused its discretion here. He essentially complains that the support obligation is inequitable in light of the fact that Dr. Krasik earns more money than he does. But Mr. Newstate again refuses to acknowledge that Dr. Krasik has been solely responsible for H.K. for practically all of the child's life, and she has incurred substantial costs because of Mr. Newstate's complete absence from H.K.'s life. We believe that the trial court was well within its discretion when it determined that the R.C. 3119.23 factors did not justify a downward deviation. We thus overrule Mr. Newstate's fifth assignment of error.

\* \* \*

**{¶31}** In light of the foregoing, we overrule all five of Mr. Newstate's assignments of error, and affirm the judgment of the trial court.

Judgment affirmed.

**ZAYAS, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.